# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2016AP897-CR |
| COMPLETE TITLE: | State of Wisconsin, |
| |       Plaintiff-Respondent, |
| |    v. |
| | Lamont Donnell Sholar, |
| |       Defendant-Appellant-Petitioner. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 377 Wis. 2d 337, 900 N.W.2d 872
(2017 – unpublished)

| | |
|---|---|
| OPINION FILED: | May 18, 2018 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | February 23, 2018 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Milwaukee |
|   JUDGE: | Rebecca F. Dallet and Thomas J. McAdams |

| | |
|---|---|
| JUSTICES: | |
|   CONCURRED: | |
|   DISSENTED: | ABRAHAMSON, J., dissents (opinion filed). |
|   NOT PARTICIPATING: | |

ATTORNEYS:

For the defendant-appellant-petitioner, there were briefs filed by and an oral argument by *Hannah Schieber Jurrs*, assistant state public defender.

For the plaintiff-respondent, there was a brief filed by *Lisa E.F. Kumfer*, assistant attorney general, and *Brad D. Schimel*, attorney general. There was an oral argument by *Lisa E.F. Kumfer*.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2016AP897-CR
(L.C. No. 2011CF4807)

STATE OF WISCONSIN : IN SUPREME COURT

**State of Wisconsin,**

    **Plaintiff-Respondent,**

 **v.**

**Lamont Donnell Sholar,**

    **Defendant-Appellant-Petitioner.**

**FILED**

**MAY 18, 2018**

Sheila T. Reiff
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 REBECCA GRASSL BRADLEY, J. Lamont Donnell Sholar seeks review of the court of appeals decision[1] affirming the circuit court's[2] order ruling that his trial counsel's failure to

---

[1] State v. Sholar, No. 2016AP897-CR, unpublished slip op. (Wis. Ct. App. June 20, 2017) ("Sholar II").

[2] The Honorable Thomas J. McAdams, Milwaukee County Circuit Court, presided over the Machner hearing and entered the order vacating one of Sholar's six convictions. See State v. Machner, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979). The Honorable Rebecca F. Dallet, Milwaukee County Circuit Court, presided over the jury trial and entered the order denying Sholar's postconviction motion.

object to an exhibit sent to the jury during deliberations constituted ineffective assistance only with respect to one of the six counts for which he was convicted. He contends that his trial counsel's ineffective assistance should result in vacatur of all six of his convictions. He also asserts the State forfeited its right to argue the prejudice prong of the ineffective assistance test at his Machner hearing because the State did not petition this court for review after the court of appeals' original decision remanding for a Machner hearing.[3] We affirm.

¶2 We hold that circuit courts reviewing claims of ineffective assistance of counsel following multiple-count trials may conclude that deficient performance prejudiced only one of the multiple convictions. Strickland v. Washington, 466 U.S. 668, 695-96 (1984), clearly contemplates such a result and does not require reversal on all counts when the prejudice proven affected only a single count. We further hold the State did not forfeit its right to challenge the prejudice prong of the ineffective assistance test when it did not petition this court for review following the court of appeals' decision in Sholar I. The issue decided adversely to the State in Sholar I

---

[3] See State v. Sholar, No. 2014AP1945-CR, unpublished slip op., ¶40 (Wis. Ct. App. June 30, 2015) ("Sholar I") (reversing Judge Dallet's order summarily denying Sholar's postconviction motion on the ground that Sholar presented sufficient evidence to warrant a Machner hearing "at least as to the sexual assault charge").

was not whether prejudice existed, but whether Sholar was entitled to a <u>Machner</u> hearing. If the State wanted to challenge whether a <u>Machner</u> hearing should occur at all, it would have needed to petition this court for review, but no petition was needed to contest prejudice. Finally, we reiterate that the <u>Strickland</u> prejudice test is distinct from a sufficiency of the evidence test.

## I. BACKGROUND

¶3 In late September 2011, Sholar and his life-long friend, Shawnrell Simmons, were arrested after two victims, E.C. and S.G., separately reported to police that they had been victims of sex trafficking by Sholar (and that other girls had been trafficked by Simmons) out of several motel rooms near the Milwaukee airport, including the Econolodge on 13th Street. The State charged both men, but their cases proceeded separately. The State charged Sholar with six counts: (1) trafficking a child (victim E.C. who was 17 years old at the time); (2) soliciting a child for prostitution (E.C.); (3) pandering/pimping (E.C.); (4) human trafficking (victim S.G., who was 21 years old at the time); (5) second-degree sexual assault, use of force (S.G.); and (6) pandering/pimping (S.G.).[4]

¶4 Sholar pled not guilty, and in April 2012 his case went to trial. Both victims testified. During E.C.'s testimony, the jury heard:

---

[4] We hereinafter refer to counts 1, 2, 3, 4 and 6 as "trafficking/pimping" counts.

3

- E.C. met Simmons through a mutual friend after which he pressured her to work for him as a prostitute. She initially refused, but, after two of her friends went to work for Simmons, and because she was desperate for money, she called Simmons. He sent her to work for Sholar because Simmons already had enough girls prostituting for him.

- Sholar picked up E.C. and her 13-year-old friend and both girls went to work for Sholar.

- Sholar, other girls, or E.C. would take "half-naked" pictures, which Sholar posted on the "Backpage" website to solicit customers.[5] In the pictures, E.C. wore lingerie or a bra and underwear.

- E.C. identified six Backpage ads, each of which had multiple pictures, depicting the girls Sholar and Simmons were trafficking——including several ads with pictures of E.C. and S.G. The ads had titles such as "Chula Ready For You-19," "Fun And Sexy Red-22," "Let's Sparkle Dazzle You-21," and "Roxy Limited Time Only Specials-19." The ads listed a contact phone number.

The jury learned through other witnesses that the contact phone number appearing in the ads matched the phone Sholar had in his possession when he was arrested.

¶5 E.C.'s testimony also revealed:

---

[5] Backpage is a classified advertising website.

- There were more Backpage ads in addition to the six previously discussed and the two additional ones E.C. identified depicting Simmons' trafficking victims, "Nicki,"[6] and another girl whose name E.C. could not remember.

- An "out-call" involved Sholar driving her to a customer who would pay her for sex while an "in-call" meant the customer would come to her motel room and pay her for sex.

- Simmons and Sholar worked together at times to transport girls to out-calls.

- Sholar gave E.C. a cell phone to use for the customer calls and to set up appointments. When the customer arrived, he would text her phone and she would either meet him and bring him to her motel room or send him her room number.

- During every appointment, which she estimated at possibly 200, she had sexual intercourse with the customer for money. She got the money upfront, $80-$100 for half-an-hour, $150-$200 for an hour. She would hide the money, give the man a condom that Sholar supplied, and have sex. When the man left, she texted Sholar so he could come back to the room and take the money.

---

[6] During trial, some individuals were referenced by their first names only. We use only first names for others for privacy reasons.

5

- Some nights she only had one or two calls, but could have as many as seven to ten.

- One time she worked a party with two girls working for Simmons after which Sholar and Simmons split the money.

- When S.G. started working for Sholar, E.C. took pictures of S.G. that Sholar posted on Backpage.

- E.C. was afraid of Sholar and the way he looked at her and screamed at her. Sometimes he punched her, which left bruises. A picture of one of her bruises was shown to the jury. He threatened her and told her she could not leave. She testified she wanted to stop prostituting "[r]ight away" but she did not have anywhere to go and she was scared. She told Sholar that she wanted to stop but he said he would find her if she tried to leave. He sent her threatening texts if he could not find her. He showed up at various places kicking and banging on doors looking for her.

- Sholar "was prostituting girls every age. The lowest age was 13." She saw three other girls who stayed at the motel—S.G., Roxy, and Nicki—also give Sholar money. Depending on the month, Sholar had up to four or five girls working for him.

¶6  E.C. testified that her work as Sholar's trafficking victim ended when E.C. borrowed her friend A.F.'s car and Sholar suggested instead of returning the car, they should sell it. E.C. said Sholar asked her if A.F. had anything else they could sell and E.C. told him about a 50-inch television she had seen

6

in A.F.'s apartment. Sholar, E.C., and another man known as Cookie drove to A.F.'s home in Sholar's red car. E.C. waited in the car and Sholar and Cookie brought down the television, and some hats and shoes stolen from A.F.'s apartment. They put the television in the back seat and the other items in the trunk. Sholar went back into the apartment to steal a smaller television, but A.F. came home, caught Sholar in the act, and called police.

¶7 E.C. testified that before police arrived, she drove Sholar's car with the stolen goods to the house where "Chrissy," the mother of Sholar's child, resided. When E.C. arrived, Chrissy told her where to park the car, and then E.C. headed back to the Econolodge because Nicki (one of Simmons' trafficking victims) called her and said the police were at the motel threatening to take Nicki's children if E.C. did not come back.

¶8 E.C. told the jury that when she returned to the Econolodge, the police had left, but the desk clerk gave her a police business card with a detective's number. E.C. called the number, but the detective was not available. The next day, the police came to the Econolodge and arrested E.C. for the burglary. She told them where Sholar's car was parked with the stolen television. The prosecutor then asked E.C. to look at several photographs, which E.C. identified as pictures of Sholar's red car with the stolen television in the back seat, and the stolen hats and shoes in the trunk. E.C. next explained that she told Detective Barbara O'Leary about working as

7

Sholar's prostitute. When asked why E.C. never called police for help to leave Sholar, E.C. said she was scared. She said that even if Sholar was in jail, Simmons could still hurt her. She testified Simmons previously hurt her: he "smacked" and "choked" her, "spit on [her] face," and held a gun to her head. She also disclosed that Simmons sexually assaulted her. She explained that Sholar also had sex with her but that was expected because she worked for him. E.C. testified that Sholar had sex with her almost every day.

¶9 S.G. also testified. When she first took the stand, she was scared and the transcript indicates she was crying. She said she was afraid that Sholar would harm her or her family because she was testifying against him. The prosecutor had to ask her background questions to calm her. After regaining composure, S.G. told the jury:

- She met Sholar, whom she called "L," when he came to help her roommate move out. Sholar seemed "very nice" and "was continuously complimenting" her and her friend. After that meeting, they started texting. At the end of July 2011, Sholar came over to "hang out for a little bit" at her place.

- Sholar started telling her and her friend about how "he had some girls that would, you know, go and do stuff for money" and that "he was a pimp." S.G. said they thought he was joking. She felt comfortable with Sholar because he was acting like a good friend, popping up when she needed a ride, and helping out "kind of like Superman."

8

As a result, she "confided in him about where [her] family stayed," about the struggles she had experienced in life, and about how she had worked as an exotic dancer in the past.

- After getting close to Sholar, he started telling her she could make $300 if she gave private half-hour dances for people he knew. She thought this would be an easy way to make a lot of money and agreed to the dancing. Her first job went smoothly and was just dancing. Later, however, Sholar took pictures of her at Econolodge with his cell phone and posted them on Backpage. Sholar gave her a cell phone and she started getting texts and calls from men who saw her Backpage ads and wanted to pay her to have sex.

- Sonya was the name S.G. had used when she danced. S.G. identified two Backpage ads, one depicting her and E.C. together, titled "Satin & Silk-21" and an ad with multiple pictures of S.G. labeled "Miss Fiery Sonya-21."

- She was shocked and told Sholar she did not want to do this, but he threatened her, saying he would harm her family, harm her, and get her evicted. Sholar told her he had broken the jaw of a girl who tried to get away from him.

- Sholar was controlling and mean and if she did not listen to him, he threatened to kill her and her family. He would remind her he knew where her family lived. He

9

showed up at her parents' home looking for S.G. and threatened her mother.

- Sholar set the price men paid to have sex with her, and she had sex with 10-15 men a night at $300/hour. These encounters were usually at the Econolodge, but sometimes Sholar took her to the men for "out-calls." She did this for about two weeks. She would take the money when the man arrived, hide it, and then have sexual intercourse with the man. Sometimes the man wanted to fulfill "weird fantasies" and that would require S.G. to call Sholar, who would tell her how much extra money the man needed to pay to complete those requests.

- Sholar gave S.G. food, drugs, alcohol, and clothes. She testified he provided her with Ecstasy, which she took because she could not have done "any kind of that stuff" sober.

- Occasionally, she and another girl would work together and have sex with the same man. She did this once with E.C. and once with Nicki, who worked for Simmons.

- Although S.G. did not want to have sex with Sholar, this happened "[p]retty often." She testified about one particular night when Sholar wanted to have sex with her, but she was tired. She tried to go to the bathroom to avoid it, but Sholar grabbed her arm "[i]n a way that made me not want to fight back," pushed her onto the bed, and forced penis-to-vagina sex on her. After that time,

10

she did not fight Sholar when he wanted to have sex with her.

- When S.G.'s boyfriend got out of jail, she tried to leave Sholar, but Sholar threatened to tell S.G.'s boyfriend how she "was sleeping with so many men." S.G. said she agreed to come back to Sholar because she did not want her boyfriend to know what she was doing. Sholar agreed to tell her boyfriend that Sholar was selling drugs for S.G., so S.G. would not have to sell them herself.

- Then one day, S.G. left the cell phone Sholar had given her with a friend thinking Sholar would be so mad, it would give S.G. a way out of the situation. S.G. went home and fell asleep. While she was asleep, Sholar called her repeatedly, leaving threatening voicemails, said he was going to set her house on fire, went to her roommate's place of work, threatened to get the roommate fired, and told the roommate she should kick S.G. out of the house or Sholar would get them both evicted and set the house on fire. Sholar came back to S.G.'s house and pounded on her bedroom windows, knocked on the doors, and harassed the neighbors looking for S.G. S.G. was inside the house with the lights off hiding in a closet.

- While in that closet, she called her mother, who called the police. Sholar had been to the mother's house earlier looking for S.G. and demanding her mother give back a cell phone Sholar gave to S.G.

11

- The police arrived at S.G.'s home and she quickly packed what she needed so the police could take her to her mother's home. At first, S.G. was too scared to tell the police the truth, but then told them a little bit about what had been happening. A few weeks later, the police came back and she disclosed more information.

¶10 On cross-examination, S.G. testified Sholar most often drove her to out-calls, but on occasion Sholar and Simmons did so together. She disclosed that on one occasion when she tried to leave without telling Sholar where she was going, he pulled her hair. She also saw him get rough with E.C. on one occasion.

¶11 S.G.'s mother testified and confirmed S.G.'s version of events. The mother testified that she received a "hysterical" call from her daughter saying there was a "man outside who wanted to kill" S.G. The mother also told the jury about how Sholar came to the mother's home looking for S.G. and asking for the phone he had given to S.G. She testified that Sholar asked for S.G. by name.

¶12 The State also called several police witnesses, who corroborated E.C.'s and S.G.'s testimony. Detective Lynda Stott testified about human trafficking and how the pimp-prostitute relationship evolves, which matched both victims' experience. Stott explained how the pimp befriends the victim, helps her, earns her trust, but when she starts working for him, everything changes. The pimp is controlling, makes her dependent on him, and threatens her if she wants to stop or wants to leave. Stott also told the jury about taking the hard drive from the

12

Econolodge's lobby computer, which had been used to post the Backpage ads, and she testified about the women's clothing and other items collected from the rooms being used by Sholar at the Econolodge. The jury saw pictures of these items, which included lingerie, high-heeled shoes, condoms, and an explicit magazine titled "Straight Stuntin."

¶13 Detective Richard McQuown, a detective with the Milwaukee Police High Technology Unit who had experience investigating human trafficking, testified about his review of E.C.'s cell phone. He created both a disk containing the contents of E.C.'s phone as well as a printout. He told the jury that the texts on E.C.'s phone evidenced human trafficking because much of the content revealed attempts to arrange meetings for sexual encounters between people who had never met. He read several of the texts to the jury, including ones that referenced "Star"——which E.C. said was her prostitute name, and one looking for "Star" and "Sonya"——referring to E.C. and S.G. McQuown also testified that the photos on this phone with girls in "various poses and semi-sexually suggestive poses" without the person's head are typically the type that get posted on Backpage or a similar site.

¶14 The State presented Detective Richard McKee as a witness. McKee also worked in the Milwaukee High Technology Unit and had experience investigating human trafficking. He examined the cell phone taken from Sholar when he was arrested. This phone's number was listed as the contact number on one of the Backpage ads posted for purposes of trafficking Sholar's

13

victims. McKee also examined the desktop computer taken from the lobby at the Econolodge, another laptop computer, S.G.'s cell phone, and Nicki's cell phone. McKee composed a summary of the contents of all these devices and created a PowerPoint presentation that was shown to the jury on a television during his testimony. McKee's presentation showed:

- Metadata from pictures of girls on Sholar's cell phone indicating the photos were taken in September 2011 at the Econolodge. These same pictures then appeared in ads posted on Backpage.

- Data recovered from the desktop computer taken from the Econolodge's lobby including Backpage ads with pictures matching images on Sholar's cell phone; these ads were uploaded to Backpage from the Econolodge computer and the internet history of the Econolodge desktop showed "234 visits to Backpage.com pages and 22 pages that were specifically relating to posting."

- Text messages from S.G.'s phone indicating the user was "Sonya" and messages referencing "in-calls" and "out-calls."

- Photos from other cell phones and a laptop computer depicting more Backpage ads and text messages referencing prostitution.

¶15 McKee testified that he examined Sholar's phone and printed its contents, which became Exhibit 79. The printout included the phone's contact list, text messages, call log, photos, and listed the audio and video files. The prosecutor

14

took McKee through each text that referenced "L." He testified about several incoming texts on that phone texting someone named "L," including from someone with E.C.'s first name and phone number. For example, there was an outgoing message to someone with E.C.'s first name that said "just so you know I also put you down as a special of $100 hour just to increase the calls 'cause something got to give; I can't keep paying for that room on my own." E.C. texted back that other girls were working from that room too: "every other girl just goes, handles business and that's it."

¶16 McKee explained the exhibit showed 1,384 total text messages between September 14, 2011 and September 28, 2011. Exhibit 79 was admitted into evidence, but was not published in its entirety to the jury during trial. The jury did, however, see and hear much of the exhibit's contents through witness testimony, McKee's PowerPoint presentation, and the individual Backpage ads, which were admitted as separate exhibits.

¶17 Detective O'Leary also testified. She confirmed much of E.C.'s version of events, including details about the A.F. burglary. She also told the jury about her interview with Sholar after his arrest for the burglary, and how he consented to the search of "his" phone, the same phone that generated Exhibit 79. She told the jury that she had left her contact card with the desk clerk at the Econolodge, which led to E.C.'s arrest for burglary. O'Leary testified that when she interviewed E.C., E.C. confessed to working as Sholar's prostitute and told O'Leary the police could find evidence of

15

prostitution on Sholar's phone. O'Leary explained how E.C. assisted O'Leary in locating and printing the Backpage ads of women who were trafficked by Sholar or Simmons.

¶18 "Nicki" also testified for the State, corroborating much of what the victims said, although she described herself as an "escort" rather than a prostitute. She admitted that sometimes she had sex with her escort dates, but claimed she worked independently. She told the jury she lived at the Econolodge and would ask Simmons for a ride if she had an "out-call." She identified three other girls, including E.C., who worked in rooms at the Econolodge. Nicki testified that E.C. stayed in a motel room with Sholar, whom she knew as "L."

¶19 Finally, Peter Wargolet, the desk clerk and night auditor at the Econolodge testified. He confirmed that E.C. was staying in Room 157 and that Sholar was paying cash for that room. Sholar paid for that room from August 15, 2011 to September 28, 2011. He also told the jury that Sholar rented a second room for two weeks in August 2011 and two other rooms for one night each in September 2011. Wargolet confirmed that another room associated with Sholar was paid for by either someone named "Nicole" or Simmons.

¶20 Sholar was the only witness for the defense. He testified that Simmons, his friend for 20 years, was the pimp. Sholar denied any involvement. He claimed the phone found on him when he was arrested belonged to Simmons, who had loaned it to Sholar because Sholar's phone had broken. Sholar admitted befriending E.C., but claimed he met S.G. only one time when he

16

was helping out her roommate, and a second time at the motel when she was working for Simmons. Sholar denied ever having sex with S.G. Sholar testified that he was staying at the Econolodge because his 14-year old son accidentally burned the kitchen in his apartment. Sholar told the jurors he sold K2, which was like marijuana but legal, but he did not drink or do drugs. He claimed he did not steal the television; rather, E.C. sold it to him. He told the jury he had been convicted four times.

¶21 In rebuttal, the State played part of the audio recording from O'Leary's interview with Sholar, during which Sholar acted as if the cell phone was his, consented to a search of it, and blamed E.C. for the burglary. O'Leary testified that Sholar identified for her both the number of the cell phone and the security code needed to unlock the phone. The State also called another police officer who responded to the A.F. burglary scene and testified that Sholar claimed he came to A.F.'s apartment to "sell some weed and then all this happened."

¶22 Detective Steve Wells testified during the State's rebuttal case that when he interviewed Sholar, Sholar told a different story about his cell phone. Sholar said nothing about his cell phone breaking; instead, Sholar claimed Simmons' cell phone had broken. Sholar told Wells that Simmons had to borrow Sholar's cell phone, which is why pictures of the girls matching the Backpage ads were found on Sholar's phone. The video recording of this interview was played for the jury. The recording showed Sholar explaining that the Backpage pictures

17

were on his phone not because he was involved in this trafficking ring, but simply because he was helping Simmons get pictures of his prostitutes since Simmons' phone was broken.

¶23 During deliberations, the jury sent a question to the circuit court: "Can we request Lamont's phone records? . . . Looking for in/outbound re: 'I got $' txt msgs while with client." In discussing the question with both attorneys, the circuit court asked:

> [I]sn't it all contained in the one exhibit that Detective McKee had, has put in the one big thick one, would all those things be answered in there? Because I don't want to be parceling out. I just want to give them the exhibit that they seem to be requesting.

The exhibit referred to was Exhibit 79. All agreed to send the entire exhibit into the jury room. The jury later asked for E.C.'s phone records, which composed Exhibit 70, and that was also sent to the jury room.

¶24 The jury returned guilty verdicts on all six counts and Sholar was sentenced. His lawyer filed a postconviction motion seeking a new trial based on ineffective assistance.[7] As material here, Sholar claimed his trial lawyer gave him ineffective assistance by failing to object "when hundreds of text messages" referencing drug dealing and other illegal activity were admitted into evidence and given to the jury during deliberations. In support of the motion, appellate

---

[7] Sholar's motion alleged additional errors not pertinent to this review.

counsel attached pages 10-109 of Exhibit 79, which contained the text messages from Sholar's cell phone. The rest of Exhibit 79, including the pictures from the cell phone depicted on pages 130-173 of the exhibit, were not included in support of the postconviction motion.

¶25 The circuit court denied Sholar's ineffective assistance claims without holding a Machner hearing, reasoning that even if parts of Exhibit 79 should have been excluded as other acts evidence, Sholar failed to prove prejudice. Sholar appealed, and the court of appeals reversed the circuit court. The court of appeals held Sholar's motion alleged sufficient facts to warrant a Machner hearing, and remanded to the circuit court.

¶26 At the Machner hearing, Sholar's trial counsel testified he filed a suppression motion seeking to exclude Sholar's cell phone, but the circuit court denied the suppression motion. Trial counsel explained that after the failed suppression motion, he felt the phone evidence was admissible and there was no basis to object to its admission. At trial, the defense theory was that Simmons, rather than Sholar, was the pimp and that the cell phone belonged to Simmons, not Sholar. Only a handful of the messages on the cell phone could be linked directly to Sholar while hundreds of them could be linked to Simmons. When the jury asked for Sholar's phone records, trial counsel did not object to the entire exhibit going to the jury because parceling down the exhibit to

19

only the messages linked to Sholar would be damaging to his client.

¶27 The circuit court ruled that Sholar failed to prove Exhibit 79 prejudiced his defense of the counts relating to sex trafficking and pimping: "So as to the trafficking counts which would be Counts 1, 2, 3, 4 and 6 I find that the performance was certainly not prejudicial as the evidence on those counts was overwhelming." The circuit court explained that "virtually all of the things Mr. Sholar complains of here came in in this trial in more than one way." That is:

> There was violence testified to by the girls. There was testimony about drug use to make it through the night. There was testimony from the girls about threats, there was testimony about burglary, there was testimony about a potential car theft. There was testimony about fetishes and there was testimony about group sex parties and the list seems to go on and on. Given that circumstance, I believe there was no chance of a different result on the trafficking counts.

The circuit court discussed Sholar's trial lawyer's strategy to not object to the admission of the texts as "sound trial strategy" given the defense theory of blaming Simmons. The circuit court noted that "[m]uch of what is in these messages is mundane."

¶28 The circuit court, however, saw the impact of Exhibit 79's admission on the sexual assault conviction quite differently. Although Sholar's argument rested on the text messages, the circuit court was most troubled by the pictures in the exhibit, which the circuit court viewed as "child porn" that "serve[d] to inflame the jury." It did not "see how a fair

20

trial could be had on the sexual assault count with the jury being given these photos." Specifically with respect to that count, the circuit court commented: "The messages and the pictures are in my opinion so inflammatory that I think a jury then and there might have convicted him of virtually anything. I do not have confidence in the result as to that count." The circuit court ruled that "as to the sexual assault count the defense clearly has shown deficient performance and prejudice." The circuit court vacated the sexual assault conviction.

¶29 The circuit court gave seven reasons why the law allowed it to distinguish the human trafficking counts from the sexual assault count and uphold the former while vacating the latter: (1) the court of appeals decision suggested the split analysis; (2) this case involved multiple counts with more than one victim and an ineffective assistance analysis must be a charge-specific decision; (3) judicial economy dictates upholding the counts that would result in the same outcome on retrial; (4) vacating the unaffected counts would "waste the time and effort of the parties"; (5) a totality of the circumstances analysis means looking at "specific facts and specific charges"; (6) the sexual assault count is "separate and apart" from the others; and (7) Strickland and the singular verdict forms support the distinction, allowing vacatur of a weakly supported conviction while upholding an overwhelmingly supported conviction.

¶30 Unhappy with the distinction, Sholar sought vacatur of all of his convictions. The court of appeals rejected Sholar's

21

arguments and affirmed the circuit court.  We accepted Sholar's petition for review.

## II.  ANALYSIS

### A.  Ineffective Assistance

¶31 Sholar contends the prejudice he proved to support his ineffective assistance claim should result in vacatur of all of his convictions, not just the sexual assault conviction.  He argues the court of appeals should be reversed because it conducted a "count-by-count" sufficiency of the evidence analysis, contrary to Strickland.  The State counters that guilt is decided count-by-count and Strickland expressly permits a reviewing court to examine prejudice in the context of an ineffective assistance claim in the same way.  It contends that the trafficking/pimping counts were not affected by Exhibit 79 because of overwhelming properly-admitted evidence supporting those convictions and because "virtually all of the things" Sholar claims prejudiced him from Exhibit 79 were already presented to the jury through properly-admitted evidence.  We agree with the State.[8]

---

[8] We note that the State did not appeal the vacatur of the sexual assault conviction nor did it appeal the circuit court's ruling that trial counsel acted deficiently in allowing Exhibit 79 to go to the jury.  Although the court questions the legal correctness of both decisions based on our review of the record, given the State's choices to forgo challenging either, we let both decisions stand without further discussion.

## 1. Legal Principles

¶32  A criminal defendant has the constitutional right to effective assistance of counsel.  See State v. Balliette, 2011 WI 79, ¶21, 336 Wis. 2d 358, 805 N.W.2d 334 (citing Strickland, 466 U.S. at 686).  To establish the assistance a defendant received was ineffective, he must prove two elements:  (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced the defense.  Id.

¶33  To prove prejudice, a defendant must establish that "particular errors of counsel were unreasonable" and "that they actually had an adverse effect on the defense."  Id., ¶24 (quoting Strickland, 466 U.S. at 693).  In assessing whether a defendant proves prejudice, the court considers the surrounding circumstances because "an act or omission that is unprofessional in one case may be sound or even brilliant in another."  Id.  We evaluate whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Strickland, 466 U.S. at 694.  In other words, we examine whether there is "a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  Id. at 695.  Our concern is whether the error rendered the trial unfair and unreliable.  Id. at 687, 689, 693-96.

¶34  In reviewing the prejudice prong, Strickland directs:

23

Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

466 U.S. at 695-96.

¶35 Ineffective assistance claims present mixed questions of fact and law. Balliette 336 Wis. 2d 358, ¶19. The circuit court's factual findings will be upheld "unless shown to be clearly erroneous," but "[t]he ultimate conclusion as to whether there was ineffective assistance of counsel is a question of law." Id.

### 2. Application

¶36 In this case, there are two related issues underlying the ineffective assistance claim: (1) whether a defendant who proves ineffective assistance as to one count, after being convicted of multiple counts, should get a new trial on all counts; and (2) whether Sholar has proven that publication of Exhibit 79 to the jury prejudiced him on the trafficking/pimping counts.

¶37 The first is an issue of first impression: if a defendant convicted of six counts proves his trial counsel's deficient performance prejudiced him on one of his convictions, is he entitled to a new trial on all six convictions? Under

24

*Strickland*, the answer is no. *Strickland* specifically recognizes that some errors will have a pervasive effect and others will have an "isolated, trivial effect." 466 U.S. at 695-96. Of particular importance in this case, *Strickland* acknowledges that some factual findings will be altogether unaffected by defense counsel's error. *Id.* at 695. A "verdict or conclusion" based on weak evidence is more likely to be affected by the error than a decision based on overwhelming evidence. *Strickland*, 466 U.S. at 695-96. *Strickland* speaks in terms of the "verdict" or "conclusion" and the "decision reached." *Id.* In single-count cases, the "verdict," "conclusion," or "decision" will be a single conviction. In contrast, in multi-count trials, the "verdict," "conclusion," or "decision" will be count-specific.

¶38 When this jury deliberated, it did not answer the single question——"is Sholar guilty or not guilty?" Instead, it rendered six separate verdicts, answering six separate questions. It determined whether Sholar was guilty or not guilty of six separate crimes. There is no basis in law or logic to require a new trial on all six convictions if the error affected only one. The circuit court gave seven legally valid and factually logical reasons supporting the split result. *See* supra ¶29. We ratify each of them.

¶39 Sholar cites three cases he claims support his "all or nothing" position: (1) *State v. Jenkins*, 2014 WI 59, 355 Wis. 2d 180, 848 N.W.2d 786; (2) *State v. Thiel*, 2003 WI 111, 264 Wis. 2d 571, 665 N.W.2d 305; and (3) *State v. Honig*, 2016 WI

25

App 10, 366 Wis. 2d 681, 874 N.W.2d 589. In Jenkins, the defendant was convicted of three crimes—first-degree intentional homicide, first-degree reckless injury, and felon in possession of a firearm. 355 Wis. 2d 180, ¶2. We overturned all three convictions, ruling that trial counsel provided ineffective assistance for failing to call a bystander witness who "would contradict or impeach the eyewitness upon whom the prosecution's entire case relied." Id., ¶¶40-48, 59 (emphasis added). In Thiel, the defendant was convicted of seven counts of sexual exploitation by a therapist, and all of the convictions were based on the credibility of a single witness. 264 Wis. 2d 571, ¶¶2-4, 13-16. We overturned all of the convictions, ruling that trial counsel provided ineffective assistance by failing to discover and use substantial impeachment evidence in cross-examining the crucial witness. Id., ¶¶26-32, 46. In Honig, the defendant was convicted of two child sexual assault charges based on the testimony of the five- and three-year-old child victims, and their Uncle Raymond. Id., ¶¶1, 33. The court of appeals overturned the convictions, ruling that trial counsel provided ineffective assistance for failing to call a witness who heard Uncle Raymond admit to framing the defendant by telling each of the child victims to make the false accusations. Id., ¶¶6, 26, 29, 33.

¶40 Sholar correctly notes that in all three of these cases, the reviewing court did not do a count-by-count prejudice analysis, but simply ordered a new trial on all the convictions. All three of these cases, however, are distinguishable from

26

Sholar's case. In Jenkins, Thiel, and Honig, the multiple charges depended on the same evidence and the deficient performance affected the reliability of that evidence. Significantly, no one argued in Jenkins, Thiel, or Honig that the prejudice affected only one count, but not others. In each case, both sides presented the argument as an all or nothing proposition. None of these cases involved circumstances where the prejudice attached to the defense of only one count, or involved one charge substantively separable from the other charges and the evidence presented, or involved one charge with less evidentiary support and other charges with overwhelming evidentiary support. Accordingly, Jenkins, Thiel, and Honig do not preclude the split-prejudice conclusion reached in Sholar's case.

¶41 Having concluded that a split result is lawful, we turn to the second issue——whether the error here prejudiced the trafficking/pimping counts. This is not a close question. The State presented overwhelming evidence to support the trafficking/pimping counts. Both victims reported independently of each other and told consistent narratives about how Sholar trafficked them. Other witnesses materially corroborated the victims' testimony, including the Econolodge desk clerk, whose testimony supplied corroborating details. Physical and forensic evidence further verified the victims' version of events. Backpage ads tied to Sholar's cell phone number, Sholar's cell phone itself, and his admission to police that the cell phone was his all supported the victims' testimony.

27

¶42 Sholar argues that Exhibit 79's publication to the jury prejudiced the trafficking/pimping convictions because the exhibit depicted him as a violent drug dealer with 150 illicit pictures on his cell phone. But the jury saw "virtually all" of the exhibit's contents, which already had been admitted into evidence. The jury heard testimony: (1) from police witnesses about the damning text messages connecting Sholar to the trafficking ring; (2) from the victims that Sholar was violent and provided them with illegal drugs; and (3) about Sholar's threats of harm to the trafficking victims and their families. During the trial, the jury already viewed many Backpage pictures, most of which were identical to the ones contained in the exhibit. During Detective McKee's testimony, the jury viewed many of the illicit photos from Sholar's cell phone on a television during McKee's PowerPoint presentation. The jury saw evidence of physical harm Sholar caused to E.C. And the jury heard and saw the fear E.C. and S.G. exhibited when each testified at trial.

¶43 In order to prove Exhibit 79 prejudiced his defense of the trafficking/pimping counts, Sholar must show that but for Exhibit 79 going to the jury, there is a reasonable probability the jury would have had a reasonable doubt as to his guilt on those charges. The record clearly thwarts Sholar's ability to do so. There is no reasonable probability that absent Exhibit 79's publication, the jury would have had a reasonable doubt as to Sholar's guilt on the trafficking/pimping convictions. One witness after the next told the same story, with specific

details corroborating other witnesses. The physical and forensic evidence including the photos, the Backpage ads, the metadata, and the Econolodge records reinforced the State's case. The result of the trial as to the trafficking/pimping convictions was fair and reliable. Sholar advances nothing to shake our confidence in the outcome of these convictions.

### 3. Clarification

¶44 Finally, we address briefly Sholar's concern that reviewing courts are incorrectly applying the Strickland ineffective assistance prejudice test. Sholar claims reviewing courts are improperly denying ineffective assistance claims by measuring prejudice under a sufficiency of the evidence test or holding defendants to a strict outcome-determinative test. We reiterate that the Strickland prejudice test is distinct from a sufficiency of the evidence test and we confirm that a defendant need not prove the outcome would "more likely than not" be different in order to establish prejudice in ineffective assistance cases. See Strickland, 466 U.S. at 693.

¶45 In reviewing a sufficiency of the evidence claim, a court upholds a conviction unless "the evidence, viewed most favorably to the state and the conviction, is so insufficient in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." State v. Poellinger, 153 Wis. 2d 493, 501, 451 N.W.2d 752 (1990). To succeed on a sufficiency claim, a defendant must show a record devoid of evidence on which a reasonable jury could convict. In contrast,

29

to succeed in proving ineffective assistance, a defendant must show that but for his lawyer's deficient performance, there is a reasonable probability the outcome would have been different. "Reasonable probability" is tied to confidence in the outcome. Both standards require a reviewing court to examine the evidence, but in sufficiency challenges, convictions are upheld when the record shows a bare modicum of evidence from which a reasonable jury could find guilt. In ineffective assistance challenges, a defendant must establish that but for his lawyer's error, there is a reasonable probability the jury would have had a reasonable doubt as to guilt.

¶46 Accordingly, a defendant need not prove the jury would have acquitted him, but he must prove there is a reasonable probability it would have, absent the error. If there is no reasonable probability that the jury would have reached a different verdict, then a defendant has not proven prejudice. See Strickland, 466 U.S. at 695-96.

B. Forfeiture

¶47 Sholar contends the State forfeited its right to argue prejudice at the Machner hearing because the State did not petition this court for review after the court of appeals' decision in Sholar I. The State denies forfeiture occurred because Sholar I did not decide the merits of the prejudice prong and had the State petitioned for review after Sholar I, the only issue "would have been whether Sholar sufficiently pled his motion to entitle him to a Machner hearing." The State is correct.

30

## 1. Legal Principles

¶48 Forfeiture is a rule of judicial administration that may be applied when a party fails to assert a right. State v. Ndina, 2009 WI 21, ¶¶28, 30, 315 Wis. 2d 653, 761 N.W.2d 612. It is primarily asserted when a party fails to object to an error at trial; its purpose "is to give the opposing party and the circuit court an opportunity to correct any error." State v. McKellips, 2016 WI 51, ¶47, 369 Wis. 2d 437, 881 N.W.2d 258.

¶49 The forfeiture rule has also been applied when a party asserts new issues before this court that were not raised in a petition for review, a response to a petition for review, or a cross-petition. See, e.g., State v. Smith, 2016 WI 23, ¶41, 367 Wis. 2d 483, 878 N.W.2d 135; State v. Sulla, 2016 WI 46, ¶7 n.5, 369 Wis. 2d 225, 880 N.W.2d 659. The purpose for forfeiture in Smith and Sulla, however, arose from the general rule that an issue not raised in the petition for review, response, or cross-petition is not properly before us. A petitioner's arguments are limited to the issues on which we granted review, unless this court orders otherwise. See Sulla, 369 Wis. 2d 225, ¶7 n.5.

¶50 A Machner hearing is a prerequisite for consideration of an ineffective assistance claim. State v. Machner, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979); see also State v. Curtis, 218 Wis. 2d 550, 554, 555 n.3, 582 N.W.2d 409 (Ct. App. 1998) ("assuming there are factual allegations which, if found to be true, might warrant a finding of ineffective assistance of counsel, an evidentiary hearing is a prerequisite

31

to appellate review of an ineffective assistance of counsel issue"). A defendant is entitled to a Machner hearing only when his motion alleges sufficient facts, which if true, would entitle him to relief. State v. Allen, 2004 WI 106, ¶14, 274 Wis. 2d 568, 682 N.W.2d 433. If a defendant's motion asserting ineffective assistance "does not raise facts sufficient to entitle the movant to relief, or presents only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief, the circuit court has the discretion to grant or deny a hearing." Sulla, 369 Wis. 2d 225, ¶23 (citations omitted).

¶51 When a circuit court summarily denies a postconviction motion alleging ineffective assistance of counsel without holding a Machner hearing, the issue for the court of appeals reviewing an ineffective assistance claim is whether the defendant's motion alleged sufficient facts entitling him to a hearing. See, e.g., State v. Love, 2005 WI 116, ¶2, 284 Wis. 2d 111, 700 N.W.2d 62.

### 2. Application

¶52 Sholar argues the forfeiture rule should have barred the State from challenging prejudice at the Machner hearing. He premises his argument on the belief that the court of appeals in Sholar I decided the merits of the prejudice prong and simply sent the case back to the circuit court to decide whether trial counsel acted deficiently. He claims the State "sandbagged" him by not filing a motion for reconsideration with the court of appeals seeking clarification of Sholar I and by not filing a

32

petition for review to alert him the State believed "the question of prejudice remained open for debate."  The law does not support Sholar's position.

¶53 First, the court of appeals could not decide Sholar's ineffective assistance claim because no Machner hearing had occurred.  A Machner hearing is required before a court may conclude a defendant received ineffective assistance.  Curtis, 218 Wis. 2d at 554-55.  In Curtis, the defendant argued his "trial counsel's errors were so obvious and could not possibly have been trial tactics, no Machner hearing was required."  Id. at 554.  The Curtis court of appeals correctly rejected that argument, noting:

> The hearing is important not only to give trial counsel a chance to explain his or her actions, but also to allow the trial court, which is in the best position to judge counsel's performance, to rule on the motion.

Id.[9]  We cited Curtis with approval in addressing whether a defendant was prejudiced when his counsel failed to object to the admission of evidence, and as a result whether this court should remand for a Machner hearing.  See State v. Beuchamp, 2011 WI 27, ¶39 & n.32, 333 Wis. 2d 1, 796 N.W.2d 780.

---

[9] There are rare circumstances when prejudice may be presumed, such as when counsel was actually or constructively denied altogether, or when a more limited presumption of prejudice is warranted, such as when counsel was burdened by an actual conflict of interest.  See Strickland v. Washington, 466 U.S. 668, 692 (1984).  None of these circumstances apply in the matter before us.

¶54 We acknowledge that appellate courts frequently decide——even in the absence of a Machner hearing——that the record conclusively demonstrates a defendant was not prejudiced by alleged deficient conduct, often presuming without deciding that counsel's performance was deficient. Id. But when an appellate court remands for a Machner hearing, it must leave both the deficient performance and the prejudice prongs to be addressed, because whether a defendant was prejudiced depends upon the existence of deficient performance. If trial counsel testifies at the Machner hearing that the choice under attack was based on a trial strategy, which the circuit court finds reasonable, it is "virtually unassailable" and the ineffective assistance claim fails. See generally State v. Breitzman, 2017 WI 100, ¶65, 378 Wis. 2d 431, 904 N.W.2d 93, citing State v. Maloney, 2004 WI App 141, ¶23, 275 Wis. 2d 557, 685 N.W.2d 620; see also United States v. Curtis, 742 F.2d 1070, 1074-75 (7th Cir. 1984) (noting defendant abandoned ineffective assistance claim because a strategic choice is "virtually unassailable."). Consequently, an appellate court should not decide prejudice exists in an ineffective assistance claim without a Machner hearing. Doing so would put the cart before the horse. For purposes of determining whether counsel was ineffective, prejudice cannot exist without being attached to an error on the part of counsel. Presuming prejudice could result in the untenable scenario of an appellate court prematurely deciding a defendant was prejudiced by an act without knowing the reason for the act, followed by a Machner hearing where trial counsel

34

gives a reasonable strategic choice for the act——meaning the defendant was not prejudiced at all, in the context of an ineffective assistance claim. Under Strickland, a court evaluates the prejudicial impact of defense counsel's errors, not counsel's reasonable strategic choices. 466 U.S. at 687 ("[T]he defendant must show that the deficient performance prejudiced the defense." (emphasis added)); Balliette, 336 Wis. 2d 358, ¶21 (defendant must show "that the deficient performance resulted in prejudice to the defense.").

¶55 Second, the forfeiture rule does not apply here. Although the forfeiture rule has been used to foreclose parties in this court from making arguments not raised in petitions for review, responses, or cross-petitions, it is primarily used to ensure parties voice objections at trial to give the circuit court and the opposing party the opportunity to correct any error. Sholar does not provide, nor can we locate, any authority suggesting the forfeiture rule should be extended to preclude the State from challenging prejudice because it did not petition this court for review following the court of appeals' decision remanding for a Machner hearing.

¶56 Third, the only issue decided adversely to the State in Sholar I was whether Sholar's postconviction motion entitled him to a Machner hearing. Thus, the only issue the State could have petitioned this court to review was the court of appeals' determination that Sholar alleged sufficient facts in his postconviction motion to entitle him to a Machner hearing. As

35

already noted, the court of appeals did not, nor could it, decide in Sholar I that prejudice had been established.

¶57 Finally, the court of appeals in Sholar II confirmed that it did not decide the prejudice part of the ineffective assistance claim in Sholar I: "This court did not rule that trial counsel's performance was deficient in any manner nor did this court rule there was prejudice as to any of the charges." Sholar II, ¶19. That is the law of the case and we see no basis upon which to reject the court of appeals' own interpretation of its prior decision, particularly because the law does not support any other interpretation.

### III.  CONCLUSION

¶58 We hold Strickland authorizes analyzing the prejudice prong of ineffective assistance claims on a count-by-count basis. We affirm the court of appeals' decision upholding the circuit court's finding that Exhibit 79 was prejudicial only with respect to the sexual assault conviction, but not the trafficking/pimping convictions. We agree with the court of appeals and the circuit court that Sholar failed to prove his lawyer's deficiency prejudiced him on the trafficking/pimping convictions, which were supported by overwhelming evidence. We further hold the State did not forfeit its right to argue the prejudice prong because the only issue it could have raised in a petition for review after Sholar I was whether a Machner hearing should occur at all.

*By the Court.*—The decision of the court of appeals is affirmed.

¶59 SHIRLEY S. ABRAHAMSON, J. *(dissenting).* The majority holds that Sholar's ineffective assistance of counsel claim fails because he is unable to demonstrate that he was prejudiced by trial counsel's failure to object to the submission of Exhibit 79[1] to the jury during deliberations.

¶60 Unlike the majority, I find the instant case to be a close call. On the whole, I conclude that Exhibit 79 is so prejudicial that my confidence in the outcome of Sholar's entire trial is undermined.

¶61 Although the majority correctly concludes that prejudice may be determined on a count-by-count basis, the majority acknowledges that there may be circumstances in which trial counsel's deficient performance results in errors that are so prejudicial that the result of the entire trial is undermined.[2]

¶62 In State v. Sullivan, the court set forth what constitutes "unfair prejudice." The Sullivan court explained:

> Unfair prejudice results when the proffered evidence has a tendency to influence the outcome by improper means or if it appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish or otherwise causes a jury to base its decision on something other than the established propositions in the case. In this case the danger of unfair prejudice was that the jurors would be so influenced by the other acts evidence that they would be likely

---

[1] Exhibit 79 is composed of the printed contents of Sholar's phone, including the phone's contact list, text messages, call log, photos, audio files, and two videos. Majority op., ¶15.

[2] Majority op., ¶¶37-40.

1

to convict the defendant because the other acts evidence showed him to be a bad man.

State v. Sullivan, 216 Wis. 2d 768, 789-90, 576 N.W.2d 30 (citations omitted).

¶63 The submission of Exhibit 79 to the jury is an example of an error with such a substantial prejudicial impact that confidence in the result of the entire trial is undermined.

¶64 The circuit court aptly recounted the prejudicial nature of Exhibit 79. It described several of the photos contained in Exhibit 79 as "child porn" that "serve[d] to inflame the jury." The circuit court did not "see how a fair trial could be had on the sexual assault count with the jury being given these photos." The circuit court opined that "[t]he messages and the pictures are in my opinion so inflammatory that I think a jury then and there might have convicted him of virtually anything. I do not have confidence in the result as to [the sexual assault] count."

¶65 It is hard to imagine anything more prejudicial than submitting child pornography extracted from the defendant's phone to the jury for its consideration during deliberations. Such inflammatory evidence creates a legitimate concern that the jury convicted Sholar not because the State proved every element of the charged crimes beyond a reasonable doubt, but instead to punish Sholar for being a bad man with child pornography on his phone.[3]

---

[3] See State v. Sullivan, 216 Wis. 2d 768, 789-90, 576 N.W.2d 30.

2

¶66 As the circuit court put it, the content of Exhibit 79 is "so inflammatory that I think a jury then and there might have convicted [Sholar] of virtually anything." I agree with the circuit court, and for that reason, I would reverse the court of appeals and remand the instant case to the circuit court for a Machner hearing.

¶67 Accordingly, I dissent.