COURT OF APPEALS
DECISION
DATED AND FILED

December 29, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing.  If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.  *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2021AP825-CR**

STATE OF WISCONSIN

Cir. Ct. No.  2018CF95

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

V.

JASON HOWARD LAVIGNE,

   DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Marinette County:  JAMES A. MORRISON, Judge.  *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.   Jason LaVigne appeals from a judgment convicting him of third-degree sexual assault and from an order denying his postconviction

motion for a new trial. The sole issue on appeal is whether LaVigne's trial counsel provided ineffective assistance by asking to send the jury an unredacted DNA report containing passages that the circuit court previously had excluded from evidence. Based upon the strength of the other evidence at trial, we conclude that LaVigne has not demonstrated the prejudice element of an ineffective assistance claim. We therefore affirm.

## BACKGROUND

¶2 The charge at issue was based upon the allegation of a sixteen-year-old girl, April,[1] that LaVigne had supplied her with alcohol and then sexually assaulted her while on a pontoon boat. April reported the incident the same day and underwent a forensic examination by a sexual assault nurse examiner (SANE). The SANE nurse documented one suction bruise, or hickey, on April's right shoulder; another hickey on her left breast; and an area near April's vaginal opening that was red and abraded and painful to the touch. The SANE nurse took swab samples from the hickeys and from April's external and internal vaginal and rectal areas, and sent them to the State Crime Laboratory.

¶3 The State Crime Laboratory detected saliva on the swab from April's breast and obtained a match to LaVigne's DNA profile. A trace amount of male DNA on the swabs from April's external vaginal areas was insufficient for further testing. A low quantity of male DNA detected on April's internal vaginal swab was not selected for further analysis. No male DNA was detected on the rectal swab.

---

[1] This matter involves the victim of a crime. Pursuant to WIS. STAT. RULE 809.86(4) (2019-20), we use a pseudonym instead of the victim's name.

¶4	Prior to trial, LaVigne moved to exclude the incomplete DNA test results from April's vaginal swabs. Based on the State's concession that the DNA results from the vaginal swabs were not probative, the circuit court excluded them from evidence.

¶5	At trial, April testified that she was a friend of LaVigne's daughter, whom we will call Erin. LaVigne drove April and Erin to a cabin on a lake to spend a day on his pontoon boat. LaVigne brought along a cooler with beer and vodka. Once they were out on the lake, LaVigne provided April with four vodka lemonades that he mixed himself. After lunch, Erin, who had also been drinking, fell asleep. LaVigne then pulled April onto his lap on the captain's chair and started forcibly touching and kissing her breasts while holding her down around her waist. LaVigne pulled off April's swimsuit bottom and made her have sex with him on the chair for about ten minutes, until Erin started to wake up. April said she was shocked and too scared to react. When they all returned to the cabin, April called her parents to come get her, told them what had happened, and went to a hospital where the SANE examination was performed.

¶6	The SANE nurse testified about the injuries she had observed on April's shoulder, breast, and vaginal area, and she authenticated photographs of the injuries she had taken during the examination. The photographs were then introduced into evidence. The nurse said the vaginal injury would be consistent with penetration by either a penis or a finger. The nurse described April's demeanor as "[q]uiet, very nervous, [and] disheveled" and observed that April appeared intoxicated. The nurse also noted that April's memory was "a little bit fuzzy," which in her experience was common for traumatized sexual assault victims. April's alcohol level came back at 0.122.

¶7 An analyst from the State Crime Laboratory testified that LaVigne was the source of DNA in the saliva sample taken from April's breast. The analyst's only mention of the vaginal swabs was to affirm on cross-examination that out of all the material she tested, the only DNA analysis linked to LaVigne came from the breast swab. However, the State introduced the analyst's report containing references to the vaginal swabs without objection.

¶8 The State presented other-acts evidence regarding two other incidents that occurred with another teenaged friend of Erin's, whom we will call Anna. In one incident, Anna testified that LaVigne had provided her with alcohol at his cabin, then touched her thighs in a hot tub and tried to pull her over to straddle him. In the other, LaVigne put his arms around Anna in a car and tried to kiss her after he had given her a ride home.

¶9 LaVigne took the stand in his own defense. He admitted that he had mixed a vodka and lemonade drink for April, although he claimed it was the girls who had brought the vodka along and that he refused April's requests for more drinks. He testified that he fell asleep in the captain's chair on the boat while Erin was sleeping on the sun deck. The next thing he knew, he awoke to find April on his lap trying to kiss him and pressing herself against him. After taking "a second" to realize what was happening, he lifted April up, slid out from under her, and went over to a nearby couch. LaVigne said April followed him to the couch, pressed her breasts into his face, climbed onto him without her swimsuit bottom on, and asked him to have sex with her. He told her to knock it off and pushed her away. By LaVigne's account, April continued to press him to have sex while "rubbing her private area" while he packed up the boat to head back to the cabin.

4

¶10     Erin testified that she and April had both been drinking vodka and lemonade on the boat before Erin took a nap. When Erin woke up, she saw April on top of her father in the captain's chair, with no swimsuit bottom on. Erin heard April saying "please" and her father say "no," as well as some "moaning and seducing" for a few minutes. By the time Erin sat up, April was back on the couch, acting "drunk and just kind of crazy" and asking for her phone so that she could call her mom. Back at the cabin, April told Erin that LaVigne had raped her. Later on, Erin texted her father to say she was not asleep on the boat, and he replied, "This is an uncomfortable conversation, but [April] was drunk and acting crazy and I kept trying to push her away." During Erin's cross-examination, the State played a portion of a jail telephone call in which Erin asked her father what to say to the police, and LaVigne told Erin to say she had seen April "trying to do stuff" to LaVigne, rather than "the other way around."

¶11     After the close of evidence, the State suggested that the DNA report should not be included in the materials sent to the jury, unless it was first redacted, because it contained the excluded information about testing of the vaginal swabs. However, at defense counsel's request, the circuit court included the entire unredacted report in the materials sent to the jury.

¶12     The jury found LaVigne guilty. LaVigne moved for a new trial, alleging that his counsel provided ineffective assistance by failing to object to having the DNA analyst's unredacted report sent to the jury. During a *Machner*[2] hearing, LaVigne's trial counsel testified that he did not object because it could be helpful to the defense to have the jury think that some unknown male's DNA had

---

[2] *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

5

been found on April. The court denied the postconviction motion, and LaVigne now appeals.

## DISCUSSION

¶13 To establish a claim of ineffective assistance, a defendant must prove two elements: (1) deficient performance by counsel; and (2) prejudice resulting from that deficient performance. *State v. Sholar*, 2018 WI 53, ¶32, 381 Wis. 2d 560, 912 N.W.2d 89. We will not set aside the circuit court's factual findings about what actions counsel took or the reasons for them unless they are clearly erroneous. *See State v. Balliette*, 2011 WI 79, ¶19, 336 Wis. 2d 358, 805 N.W.2d 334. However, whether counsel's conduct violated the constitutional standard for effective assistance is ultimately a legal determination that this court decides de novo. *See id.*

¶14 We need not address both elements of the ineffective assistance test if the defendant fails to make a sufficient showing on one of them. *State v. Swinson*, 2003 WI App 45, ¶58, 261 Wis. 2d 633, 660 N.W.2d 12. Here, we conclude that LaVigne has failed to establish prejudice.

¶15 A defendant proves prejudice by demonstrating there is a reasonable probability that, but for counsel's unprofessional conduct, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 694 (1984). The "reasonable probability" standard does not require a showing that it is "more likely than not" that a jury would have acquitted the defendant. *Sholar*, 381 Wis. 2d 560, ¶¶44-45. Still, the "reasonable probability" standard is tied to the reviewing court's confidence in the outcome, and the "likelihood of a different result must be substantial, not just conceivable." *Id.*, ¶45; *Harrington v. Richter*, 562 U.S. 86, 112 (2011) (citation omitted). Thus, there is no reasonable

probability of a different result based on alleged errors in a criminal trial when the conviction was otherwise supported by overwhelming evidence. *Sholar*, 381 Wis. 2d 560, ¶58.

¶16 We are satisfied that the evidence against LaVigne was overwhelming. That evidence included: (1) April's direct testimony describing the assault; (2) three documented injuries from the SANE examination consistent with April's description of the assault; (3) LaVigne's DNA in the saliva sample taken from the hickey on April's breast—which was inconsistent with LaVigne's own account of the incident; (4) Erin's partially corroborating testimony that her father had provided the girls with alcohol and that she had seen April straddling her father in the captain's chair without a swimsuit bottom; (5) the recorded jail call in which LaVigne coached Erin to support his version of the incident; and (6) the other-acts evidence.

¶17 In addition, there is no indication in the record that the jury actually looked at the DNA report. While the jury did ask several questions during its deliberations, none pertained to the DNA evidence. The jury did not expressly ask for the report; it was merely sent with twenty-nine other exhibits. Nor did the State or LaVigne's trial counsel during closing arguments invite the jury to read the report. In conjunction with the evidence at trial, we conclude there is no reasonable probability that sending the jury a redacted copy of the DNA report rather than the full report would have led to a different result at trial.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5. (2019-20).