COURT OF APPEALS
DECISION
DATED AND FILED

February 9, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.  **2019AP1406-CR**

STATE OF WISCONSIN

Cir. Ct. No.  **2016CF61**

**IN COURT OF APPEALS
DISTRICT III**

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

 V.

TIMOTHY J. OGREN,

   DEFENDANT-APPELLANT.

          APPEAL from a judgment and an order of the circuit court for Price County:  ANN KNOX-BAUER, Judge.  *Affirmed*.

          Before Stark, P.J., Hruz and Seidl, JJ.

          **Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

          ¶1     PER CURIAM. Timothy Ogren appeals from a judgment convicting him of two counts of sexual assault of a child and an order denying his

postconviction motion. Ogren claims his trial counsel rendered ineffective assistance by failing to impeach a State's witness with prior convictions, and by failing to investigate and present exculpatory witnesses for the defense. We conclude Ogren has failed to demonstrate prejudice from his counsel's alleged errors. Accordingly, we affirm.

## BACKGROUND

¶2 The State charged Ogren with one count of first-degree sexual assault of a child under the age of twelve by intercourse and two counts of first-degree sexual assault of a child under the age of thirteen by sexual contact. The charges were based on the allegations of a four-year-old girl, Tabitha, that Ogren had put his "pee pee" in her mouth and in her "butt crack" while both were staying at the house of Tabitha's maternal grandparents, Rachel and James.[1]

¶3 At trial, the State played a video recording of a forensic interview with Tabitha. When asked if there were certain parts of a girl's body that other people should not see or touch, Tabitha said, "the butt, and the dee-dee, and the boobies." Tabitha identified the "dee-dee" as the vaginal area on a drawing of a female body.

¶4 Tabitha initially told the interviewer that no one had seen those parts of her body. However, when asked if someone ever wanted to see her butt, she

---

[1] Pursuant to the policy underlying WIS. STAT. RULE 809.86(4) (2017-18), we use pseudonyms when referring to the victim, her mother and maternal grandparents, and another child who testified to other acts evidence.

All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

responded that Ogren "likes to wrestle with me" and added that "he likes to lick my dee-dee and my butt." She said, Ogren licked her like "a dragon," or "a dog" two times on the bed in her mother's room at her grandparents' house, while her grandparents were downstairs watching television.

¶5 Tabitha also told the interviewer that, on the same two days that Ogren licked her "dee-dee" and butt, he also told her to "drink the milk" from his "pee-pee." Tabitha identified the "pee-pee" as the crotch area on a drawing of a male body. She said that Ogren got "sweaty and hot" when he asked her to "drink the milk," and that he also had her touch his "pee-pee."

¶6 Tabitha said she had lived with her grandparents in Park Falls for "one whole day." She did not make any other assertion as to when the incidents had occurred. She also had difficulty answering questions about the difference between truth and lies.

¶7 Rachel testified that her daughter Nancy and granddaughter Tabitha had come to live with Rachel and James at their house in Park Falls in August 2015. According to Rachel, Ogren also stayed at their Park Falls house "pretty much full time" between December 2015 and September 2016. Ogren shared Nancy's bedroom upstairs, while Tabitha either slept in the upstairs bedroom with Ogren and her mother or in a downstairs bedroom with Rachel and James. There were times when Ogren was alone in the house with Tabitha and times when Ogren was alone with Tabitha upstairs while Rachel and James were downstairs and Nancy was at work.

¶8 Nancy likewise testified that Ogren had lived with her at the Park Falls house beginning in December 2015; that Ogren shared an upstairs bedroom with her and sometimes Tabitha; and that Ogren was sometimes in the

house with Tabitha, Rachel and James while Nancy was at work. Nancy further testified that the upstairs bedroom was not visible from downstairs, and that someone downstairs would have no idea what was going on in the upstairs bedroom.

¶9      The State also presented the videotaped interview of a six-year-old child, Natalie, who alleged that Ogren had assaulted her at the home of Ogren's mother, Jacqueline Burt, when Natalie was in kindergarten and both she and Ogren were staying at Burt's house in Sawyer County. Natalie said that on three different occasions while Ogren was babysitting her, Ogren touched her private area with his finger under her pajama bottoms and underwear.

¶10     Ogren took the stand in his own defense. He denied having ever touched either Tabitha or Natalie inappropriately. He claimed that he had never been alone in a house with Natalie, and that she was just "mixed up."

¶11     Ogren also denied ever having been alone in the Park Falls house with Tabitha. However, he did not deny having been alone with Tabitha in the upstairs bedroom that he said he shared with Nancy and Tabitha "for at least three months" while he bounced back and forth between his mother's house and the Park Falls house. To the contrary, Ogren corroborated Tabitha's statement that he would wrestle with her, and he said that the upstairs bedroom where they played was where he spent "pretty much 90 percent of the time" that he was in the Park Falls house. Sometimes, he would just be wearing his boxer shorts in the bedroom due to the heat.

¶12     Ogren suggested that Tabitha's reference to drinking his milk may have come either from his attempts to get Tabitha to drink "actual milk that comes from a cow," or from a time when he used the bathroom while she was taking a

bath. Ogren claimed Tabitha had seen his penis in the bathroom and asked him if that was where milk came from. He testified that he had reported that incident to James.

¶13 When asked why Tabitha would say that Ogren liked to lick her vaginal area, Ogren said Tabitha liked to jump on him like he was a jungle gym and thought it was funny to sit on his head once in a while. Ogren also claimed that Tabitha might have seen Ogren and Nancy having sex one night because the following morning Tabitha asked Nancy if Ogren could do to Tabitha what he had done to Nancy.

¶14 On rebuttal, James denied that Ogren ever told him about an exposure incident in the bathroom, and Nancy denied any conversation about Tabitha asking whether Ogren could do to her what he did to her mother.

¶15 The jury found Ogren guilty on the count of sexual assault by intercourse (based on Ogren performing an act of cunnilingus on Tabitha) and on one of the two counts of sexual assault by sexual contact (based on Ogren causing or allowing Tabitha to touch his penis). After the circuit court sentenced Ogren to consecutive terms totaling thirty-five years' initial confinement and thirty years' extended supervision, Ogren moved for a new trial based upon ineffective assistance of his trial counsel and/or newly discovered evidence. Ogren claimed that his trial counsel was ineffective for failing to impeach Rachel with a known prior conviction, failing to discover and impeach Rachel with a second prior conviction, and failing to interview and produce Ogren's parents as defense witnesses.

¶16 At the postconviction hearing, Burt testified that her son was living at her house in Sawyer County during the entire period of time over which he was

5

alleged to have committed the assaults against Tabitha, except for a brief time when he lived with Nancy in a mobile home in Fifield. Burt claimed that when Ogren visited the Park Falls house, he and Nancy would go upstairs and Tabitha would stay downstairs by her grandparents, so Ogren was never alone with Tabitha. Burt accompanied her son on three or four such visits. Burt further testified that Ogren was living with her during the period of time he was alleged to have assaulted Natalie. She said she would not have allowed Ogren to have been alone with Natalie in Sheboygan County (where Natalie primarily lived), because that would have violated his bail or probation conditions of "house arrest," and her own "house was on the line for that."

¶17    Ogren's father, Gordon Ogren, testified that he believed Ogren had been living with his mother during the time frame when he was alleged to have assaulted Tabitha, but he thought Ogren had been going to Park Falls "fairly often" to visit for three or four days at a time. Gordon did not know whether Ogren would have been alone with Tabitha at the Park Falls house because he was not there more than one time. Gordon also testified that a condition of his son's probation during the time he was alleged to have assaulted Natalie prohibited him from leaving the county. He said Ogren would have no way and no reason to go to Sheboygan County.

¶18    Counsel for both parties agreed that the circuit court had ruled Rachel could be impeached with a 1993 conviction for sexual assault of a child, but that neither party had asked Rachel at trial about prior convictions. The court took judicial notice that Rachel had a second prior conviction for operating after revocation (OAR) in 2005 that had not been discovered by the parties due to a date of birth error listed in the record.

6

¶19    The circuit court denied the motion for a new trial. It first noted that it probably would not have allowed the OAR conviction to be used for impeachment because it was a low-level misdemeanor that did not involve truth or veracity and was over twelve years old at the time of the trial. In any event, the court concluded that impeaching Rachel with the sexual assault conviction would not have changed the outcome of the trial because Rachel's testimony about the living arrangements in her house was corroborated by Nancy, James, and Ogren himself. The court further concluded that the testimony of Ogren's parents would not have changed the outcome of the trial because they had no personal knowledge about most of the time Ogren spent at the Park Falls house.

## DISCUSSION

¶20    A claim of ineffective assistance of counsel requires the defendant to demonstrate two things: (1) deficient performance by counsel; and (2) prejudice resulting from that deficient performance. *State v. Swinson*, 2003 WI App 45, ¶58, 261 Wis. 2d 633, 660 N.W.2d 12. We will not set aside the circuit court's factual findings about what actions counsel took or the reasons for them unless they are clearly erroneous. *State v. Pitsch*, 124 Wis. 2d 628, 634, 369 N.W.2d 711 (1985). However, whether counsel's conduct violated the constitutional standard for effective assistance of counsel is ultimately a legal determination that this court decides de novo. *Id.* We need not address both components of the ineffective assistance test if the defendant fails to make a sufficient showing on one of them. *Swinson*, 261 Wis. 2d 633, ¶58.

¶21    Here, we conclude that Ogren has failed to satisfy the prejudice element of the test for ineffective assistance of counsel. A defendant demonstrates prejudice by showing there is a reasonable probability that, but for counsel's

unprofessional conduct, the result of the proceeding would have been different. ***Strickland v. Washington***, 466 U.S. 668, 694 (1984). The "reasonable probability" standard does not require a showing that it is "more likely than not" that a jury would have acquitted the defendant. ***State v. Sholar***, 2018 WI 53, ¶¶44-45, 381 Wis. 2d 560, 912 N.W.2d 89 (citing ***Strickland***, 466 U.S. at 693). Still, the "reasonable probability" standard is tied to the reviewing court's confidence in the outcome, and the "likelihood of a different result must be substantial, not just conceivable." ***Id.***, ¶45; *see also* ***Harrington v. Richter***, 562 U.S. 86, 111-12 (2011) (citing ***Strickland***, 466 U.S. at 693).

¶22 Counsel's failure to impeach Rachel with her two prior convictions does not undermine our confidence in Ogren's convictions. As to Rachel's OAR conviction, the circuit court could properly have disallowed use of the conviction for impeachment purposes pursuant to WIS. STAT. 906.09(2). Even if both convictions had been introduced, there is no substantial likelihood that such impeachment would have altered the outcome of the case, given that Rachel's testimony about the living arrangements in her house was corroborated by that of several other witnesses, as described above.

¶23 Ogren contends that his parents' testimony would have further undermined Rachel's testimony along with that of all the other witnesses who testified that Ogren lived in the Park Falls house throughout the entire time period when the assaults on Tabitha were alleged to have occurred. However, the opinions of Ogren's parents that Ogren was never alone with Tabitha in the Park Falls house would not have carried much weight because neither of Ogren's parents spent much time in that house. Rather, both of Ogren's parents admitted that—at the very least—Ogren visited Tabitha there. Moreover, Tabitha did not claim that she was alone in the house when the assaults occurred. She said her

grandparents (that is, Rachel and James) were downstairs. In short, disputes about whether Ogren was living in or just visiting the Park Falls house, and exactly how often he was there, would not change the fact that—by his own admission—Ogren had the opportunity to commit the assaults against Tabitha in the place she described, and during the time period alleged.

¶24 Similarly, Ogren's parents' testimony that Ogren never went to Natalie's house in Sheboygan County was irrelevant because the assault against Natalie was alleged to have taken place at Burt's house in Sawyer County. Ogren's own testimony established that Ogren and Natalie stayed together in Burt's house for a period of time. We conclude that Ogren was not prejudiced by his trial counsel's failure to interview Ogren's parents or present them as witnesses. Accordingly, the circuit court properly denied Ogren's motion for a new trial.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.