COURT OF APPEALS
DECISION
DATED AND FILED

August 19, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP872-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2020CF830

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

 V.

BRADLEY ALLEN BUTLER,

   DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Outagamie County: MITCHELL J. METROPULOS, Judge. *Affirmed*.

Before Stark, P.J., Hruz, and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Bradley Allen Butler appeals from a judgment convicting him, pursuant to his no-contest pleas, of second-degree sexual assault

of a child under age 16, using a computer to facilitate a sex crime, and child enticement. He also appeals from an order denying his postconviction motion. On appeal, Butler seeks sentence modification or, in the alternative, resentencing on the following bases: (1) the circuit court relied on inaccurate information when sentencing him; (2) information in the text messages between Butler and the victim is a new factor warranting sentence modification; and (3) his defense counsel provided constitutionally ineffective assistance of counsel. We reject Butler's arguments and affirm.

## BACKGROUND

¶2 The charges in this case arose out of Butler's communications by text message with 14-year-old Siara,[1] which eventually culminated in Butler taking Siara to a motel room in the Town of Grand Chute and sexually assaulting her. According to the amended criminal complaint, which Butler agreed provided the factual basis for his no-contest pleas, Siara first received a text message[2] from Butler sometime in early September 2020, stating, "Don't forget whose birthday it is today." Siara did not know Butler when he first messaged her, and she "told [him] sorry she wasn't the person he thought she was."

¶3 Nevertheless, Butler and Siara continued to message back and forth. According to Siara's interview with police, Butler "started weirdly flirting with"

---

[1] Pursuant to the policy underlying WIS. STAT. RULE 809.86(4) (2023-24), we use a pseudonym to refer to the victim in this case.

All references to the Wisconsin Statutes are to the 2023-24 version.

[2] Siara told law enforcement that "she currently doesn't have a phone and she wanted to be able to get a hold of her friends," so she "used [the] TEXTFREE app to communicate with her friends," and that is where Butler messaged her.

her during their text conversations, which occurred over the course of approximately two weeks, despite the fact that Butler became aware early on that Siara was only 14 years old.[3] According to Siara, Butler offered to take her out to lunch, but she was busy that day. Butler then "told her that if she is ever having a bad day or something he can take her out to lunch."

¶4 The first time Butler and Siara met in person, Butler picked Siara up and dropped her off at a Family Dollar store that was close to her house. Siara reported that their meeting "wasn't anything weird[;] they just ended up driving around" and "talking about simple things such as how her school was going." Butler later sent her a message asking if they could hang out again.

¶5 Then, on September 23, 2020, Siara reported that "something happened with her ex-boyfriend" that "made her really upset," and she "reached out to [Butler] to see if they could hang out." Although Butler did not live in the area, he was in Appleton, Wisconsin, "just hanging out as he had a meeting the next day." Butler picked Siara up from the same Family Dollar parking lot. According to Siara's interview with the police,

> when she got into the car she didn't smell any food so she asked [Butler] if they were going to go get some food. [Butler] told her that he already had it back at his hotel room. When they arrived at the hotel they didn't go through the main doors, they used a side entrance and [Butler] was carrying a big black backpack with him. Once [Siara] got into room #303 she stated she didn't smell any food either. [Siara] asked [Butler] about the food and he didn't respond.

---

[3] Butler also informed Siara that he was 40 years old, but he was actually 41 at the time.

¶6      Siara reported that Butler started to make sexual advances toward her. Siara told police that she "stopped [Butler], telling him that [s]he wasn't sure if she wanted to do this," but "[Butler] assured [Siara] she would be fine." Butler then removed "a collar with a leash" from his backpack, which she discovered was filled with more sex toys, and he told Siara "that she ha[d] to wear it and she told him she didn't want to but [Butler] put it on her anyways" and "started pulling on the collar."[4] Butler then had sexual intercourse with Siara three times.

¶7      After they left the motel, Butler dropped Siara back off at the Family Dollar, but Siara's mom was there looking for her and became suspicious when she saw Butler. Siara's mom questioned Siara about Butler, and she eventually checked the text messages in Siara's Chromebook, after which Siara "ended up coming clean to her mom and telling her everything that happened." Siara told law enforcement that

> she talked with [Butler] because it felt like she had a friend and that someone actually needed her. [Siara] stated when [Butler] starting flirting with her she didn't want to say that she didn't like it because she thought that [Butler] would cut her off. [Siara] stated she did flirt back with [Butler] and thinks that he got the wrong signal.

¶8      When Butler was questioned by police, he admitted meeting up with Siara twice, but he denied having sexual intercourse with her. According to the amended complaint, Butler told law enforcement that Siara "want[ed] to hook up and they both are into certain [sexual] things which would be cool to do

---

[4] In the amended complaint, Siara noted that "at the time she didn't recall them previously talking about [the collar] but when she checked the messages she found the picture [Butler] sent her" of the collar. Within the text messages, they discussed BDSM, which is defined as "sexual activity involving such practices as the use of physical restraints, the granting and relinquishing of control, and the infliction of pain." *BDSM*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/BDSM (last visited August 4, 2025).

someday." Butler explained that in the motel room Siara "really wanted to do things and wanted to lead as she is sexually heightened, and she wanted to be dominated and when they were in the room he bossed her around a little bit calling her names." According to Butler, Siara "wanted to wear a collar and she put one on." Nevertheless, he continued to deny having sexual intercourse with Siara. Eventually, however, Butler admitted to having sexual intercourse with Siara to another law enforcement officer.

¶9 Butler pled no contest to all the charges in the amended complaint: second-degree sexual assault of a child under age 16, using a computer to facilitate a sex crime, and child enticement. At sentencing, Siara's mother and grandmother (hereinafter, Siara's family) both provided statements to the circuit court regarding the severe mental impact that Butler's actions had on Siara and her family. The State then argued that the gravity of the offenses were reflected in the impact on the victim, as described by Siara's family. The State further noted that although Butler had no previous record, his character was demonstrated by his "predatory behavior … in this specific instance."

¶10 In defense counsel's sentencing remarks, he disputed "the police perspective and the prosecution's perspective on what happened in this case." Counsel insisted that Butler is not a pedophile, that "he does not have the pathology of a pedophile," and that "no child pornography [was] found" or any "indications of any interest in children" during the "exhaustive review" of Butler's life. Instead, defense counsel told the circuit court that the text messages between Butler and Siara, which counsel did not provide to the court, show that "[t]his young lady was unusually sexually aggressive." Counsel elaborated:

> It wasn't [Butler] that first suggested meeting and it wasn't [Butler] that first suggested sex and it wasn't [Butler] who first mentioned [BDSM] and it wasn't

[Butler] who first mentioned any number of sexually related activities as far as way back. And I mean way back the phrases that are in these texts are including what about sexuality? What do you look for there, [Siara] says? Are you into, like, BDSM, she says? I mean some of this stuff is just not even appropriate. I want you to pull my hair and do this, that, and the other thing to me so hard. This idea that this was like a kidnapping or that this was a sneak attack or that this was some sort of surprise is just not the case.

The idea that this dog collar is sprung at the last second when she's trapped in a hotel room against her will is not true. It's in the texts back and forth. They are talking about it and how much she would enjoy it. That doesn't mean he's not guilty. He is guilty. He did this and he's going to pay for it, but this is not the case that's being presented to the [c]ourt with someone who grabbed an unwilling participant.

They talk about the hotel room in the text. It's her suggestion. It's in here. He's 42 and she is 14. Is this supposed to be happening? Hell no, it's not; and you are going to sentence him for that.

¶11 The circuit court ultimately imposed concurrent sentences on all three counts, totaling ten years' initial confinement followed by five years' extended supervision. During the circuit court's sentencing remarks, it properly noted the sentencing factors that it was required to consider, including "the severity of the offense, the impact it's had on the victim and her family," "the impact the crime has had on the defendant's family," the "public protection, the character of the defendant, his lack of prior record, his rehabilitative needs, and any potential for rehabilitation." The court referred to Siara's family's remarks, observing that they described how Siara "was virtually destroyed emotionally because of this event." The court explained that the impact on Siara, the impact on Butler's own family, and the need to protect the public were all "significant."

¶12 Additionally, the circuit court agreed with defense counsel that there is no evidence Butler is a pedophile, but it noted that it is clear that he "has a sexual addiction" and that "he is a sexual predator who tries to groom people and

certainly groomed the victim here to place her in a hotel room and sexually assault[] her." According to the court,

> [Siara] was unable to consent given her age; and [Butler] took advantage of her emotional state at the time. Even if the initial contact was innocent, once he established the relationship his clear purpose was to isolate her and to have sex with her. And that's what he did and he utilized tactics that we see in sex predators where he's giving her food, giving her jewelry, taking her out. You know, you've got to think of this, where this victim's at, a young girl who is having difficulty as any young girl would with relationships and adjusting to those teenage years and having a male come into her life that is paying attention to her and then to abuse that relationship for sexual gratification.

The court concluded that Butler "obviously has significant sexual deviancy issues that have to be addressed and they have to be addressed in a confined setting."

¶13 Thereafter, Butler filed a postconviction motion for sentence modification or, in the alternative, resentencing. The basis for Butler's motion was his belief that relevant information in the text messages between Butler and Siara "undermine[d] the narrative presented by the State" and Siara's family and further "impacts the ultimate conclusions of the court." (Formatting altered.)

¶14 According to Butler, "[t]hose messages paint a very different picture of the relationship between Mr. Butler and [Siara]," including "the nature of Mr. Butler and [Siara's] meet up and ultimate sexual encounter" as well as "the allegations made by the State that Mr. Butler[] groomed and manipulated [Siara] into engaging with him when she was an unsure and unwilling party." As a result, Butler alleged that he was sentenced based upon a materially inaccurate understanding of the facts underlying his offenses. He also argued, in the alternative, that the text message exchange was a new factor that was highly relevant and was unknowingly overlooked by the court at the time of sentencing. Finally, Butler asserted that his defense counsel provided constitutionally

7

ineffective assistance of counsel by failing to present the entire text message exchange to the circuit court.

¶15    The circuit court held a **_Machner_**[5] hearing on the motion. At the hearing, defense counsel testified that he believed that Siara's family's statements at sentencing were "relatively standard victim hyperbole," such "that they had their own thoughts of what that information was and what it meant to them, and [he] thought they were within their rights at a sentencing to say what they felt about it." When asked whether defense counsel thought about providing the circuit court an opportunity to review the text messages, counsel stated: "No. That is something I never would have let happen, ever. That was not going to be part of my sentencing presentation at any time." According to defense counsel, he "didn't think [the text messages] were helpful to [Butler] at all," he "did not think … the information in the texts[] [was] so exculpatory or so helpful to the cause that it would be helpful to [Butler] to present those [texts] to the [c]ourt," and he "thought it would be an absolute disaster if [he] were to give the full context of the texts to [the court] for [it] to peruse minutes before [it] was deciding whether to send [Butler] to prison."

¶16    Defense counsel went on to explain that he did not believe entering the text messages into evidence "would be a wise move at a sentencing where [Butler was] supposed to be taking responsibility for what was done here to turn around midstream and then say it's all [the victim's] fault" because that "sounds more and more like victim bashing, which … can be a fatal mistake for defense counsel to make in the course of a sentencing." He acknowledged that "[t]he texts

---

[5] **_State v. Machner_**, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

contained as much damning information as helpful information." Finally, defense counsel argued that he *did* use the text messages in his sentencing remarks to challenge the State's and Siara's family's statements.

¶17 The circuit court denied Butler's postconviction motion by oral ruling. It first stated that Siara's family's remarks about the impact that the sexual assault had on Siara did not constitute inaccurate information, and the court explained that while it "certainly listens" to what victims' families say, "[i]t doesn't necessarily take in their view as gospel factually as to what happened."

¶18 The circuit court then considered the text messages between Siara and Butler. It suggested that even if the "text messages tell us something different," "it's not incredible that the victim could have at the time of the incident said she didn't want to do this and could have said that repeatedly." It went on to explain that "the State is just repeating the information that was given to law enforcement by the victim, and they have every right to do so. And I don't find that as being inaccurate information given to the [c]ourt." The court also stated that it had reviewed the text messages in preparation for the hearing. It concluded that the text messages would have had no impact on the sentence it imposed—i.e., any error was harmless—and that had it reviewed the messages prior to sentencing, it might have even been convinced to increase the sentence.

¶19 For these same reasons, the circuit court determined that Butler had failed to prove a new factor that warranted sentence modification. As the court explained, "In some respects [the text messages] just confirmed this [c]ourt's own analysis that Mr. Butler did groom this 14-year-old. He engaged in conversations that were mutual, that led up to their actually having physical contact with each other and eventually the sexual assault that took place."

9

¶20 Finally, the circuit court rejected Butler's ineffective assistance of counsel claim. The court reiterated that had it reviewed the text messages prior to sentencing, it would not have benefited Butler. Accordingly, it found that defense counsel's "behavior at sentencing met the professional bounds of utilizing appropriate discretion" and that Butler suffered no prejudice.

¶21 The circuit court memorialized its oral ruling by written order. Butler appeals.

## DISCUSSION

¶22 On appeal, Butler renews the same claims he made in his postconviction motion. In its response brief, the State reframed Butler's presentation of the issues based on its belief that "the outcome turns on how this [c]ourt evaluates [defense] counsel's decision not to introduce the text messages to correct the allegedly inaccurate remarks by the victim's [family] at sentencing." As we agree with the State, we will address Butler's claims in the order in which the State presented them.

## I. Ineffective assistance of counsel

¶23 Butler asserts that his defense counsel provided constitutionally ineffective assistance when he failed to introduce the text messages at sentencing and "when he failed to correct misrepresentations made to the court by the State." (Formatting altered.) Butler argues that "there can be no strategic choice for failing to present this information when it was clear in all the pleadings that the factual picture represented by the [State] was very different than the reality demonstrated by the messages." As Butler explains, "these text messages give more color to an ongoing exchange between [Siara] and Mr. Butler that was

10

completely mischaracterized at sentencing." Although Butler acknowledges that defense counsel referenced the text messages at sentencing, he contends that "those brief references simply do not pack the same punch as the actual texts would have."

¶24 Butler further contends that, as a result of defense counsel's alleged deficient performance, "Butler was prejudiced as the court had no information at its disposal to counter its concerns about the risk posed by" Butler, as argued by "the State and [Siara's] family[]." According to Butler, the circuit court was swayed by the State's presentation of the case because the court "specifically referenced the alleged 'grooming' pattern," and, as a result, "the court was left with no choice but to reach the conclusion that Mr. Butler had deeply concerning sexual deviancies and that the public needed long term protection from him in the form of a lengthy prison sentenc[e]."

¶25 "Whether a defendant was denied effective assistance of counsel is a mixed question of law and fact." *State v. Breitzman*, 2017 WI 100, ¶37, 378 Wis. 2d 431, 904 N.W.2d 93. "The factual circumstances of the case and [defense] counsel's conduct and strategy are findings of fact, which will not be overturned unless clearly erroneous; whether counsel's conduct constitutes ineffective assistance is a question of law, which we review de novo." *Id.*

¶26 To successfully bring an ineffective assistance of counsel claim, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). If a defendant fails to make a sufficient showing on one prong of the *Strickland* test, we need not address the other. *Id.* at 697. In this case, we need not address the prejudice prong—i.e., whether Butler can show that

11

but for his defense counsel's alleged error, there is a reasonable probability that his sentence would have been different, *see* ***State v. Sholar***, 2018 WI 53, ¶45, 381 Wis. 2d 560, 912 N.W.2d 89—because Butler cannot show that his defense counsel performed deficiently.

¶27 To prove deficient performance, the defendant must point to specific acts or omissions by defense counsel that are "outside the wide range of professionally competent assistance." ***Strickland***, 466 U.S. at 690. "Courts afford great deference to [defense] counsel's conduct, presuming that it 'falls within the wide range of reasonable professional assistance.'" ***State v. Savage***, 2020 WI 93, ¶28, 395 Wis. 2d 1, 951 N.W.2d 838 (citation omitted). "[W]here a lower court determines that counsel had a reasonable trial strategy, the strategy 'is virtually unassailable in an ineffective assistance of counsel analysis.'" ***Breitzman***, 378 Wis. 2d 431, ¶65 (citation omitted).

¶28 We conclude that Butler has failed to prove that defense counsel performed deficiently because counsel made a strategic decision not to introduce the text messages to the sentencing court. Defense counsel specifically testified at the ***Machner*** hearing that he could have easily provided the text messages to the circuit court at sentencing, but he made the conscious, strategic decision not to do so because he did not think "they were helpful" to Butler, and he, instead, "thought it would be an absolute disaster if [he] were to give the full context of the texts to" the circuit court. Counsel further explained that he did not want to enter the forbidden realm of "victim bashing," but he still addressed some of the information in the text messages during his sentencing remarks to challenge the State's version of events and Siara's family's statements.

¶29 The circuit court, in its oral ruling, agreed with counsel's assessment of the text messages, stating:

> [I]f the [c]ourt would have been given those complete text messages at the time of sentencing or even before that it certainly would not have been advantageous to Mr. Butler because the [c]ourt has had a chance to review those complete text messages as provided by counsel; and it just demonstrates how disturbing his behavior was.
>
> Again, he's the adult and it's not like he's 17, she's 15, and they're teenagers talking about sex. He's an adult. He's 42 years old. She's 14. And to have these intimate discussions about sexual activity, even if she's consenting or responding, it's totally inappropriate; and if the Court had had that information, it would not have favored the defendant one bit. In fact, it may have caused him to have more significant a sentence; but certainly I can't go back and try to pretend what I would have done at the time but it would not have benefited him.

¶30 Given defense counsel's testimony that the decision not to provide the circuit court with the text messages was a strategic decision, and the court's conclusion that this was a reasonable strategic decision based on the court's agreement that the text messages would not have been beneficial to Butler, that "strategy 'is virtually unassailable,'" and we see no basis to conclude that counsel's performance was deficient. *See **Breitzman***, 378 Wis. 2d 431, ¶65 (citation omitted). Butler's argument on appeal is based entirely on his belief that the text messages would have benefitted him and that they would "give more color to an ongoing exchange," but he fails entirely to address the court's finding that the evidence would have likely been detrimental. As the State argued, "Butler believes it was prejudicially deficient performance for counsel not to ask the court to review those text messages to prove, apparently, that the 14-year-old victim shares the blame because she seduced him." But this notion ignores the fact "that a 14 year old legally cannot consent to sex with an adult" and the fact "that the 41-year-old Butler could have put an immediate halt to this simply by no longer

exchanging text messages, especially sexually charged messages, with a vulnerable child who was a stranger to him." Butler's ineffective assistance of counsel argument fails.

## II. Inaccurate information at sentencing

¶31 Butler next argues that the circuit court considered inaccurate information "when it relied upon a false description of the nature of Mr. Butler's conversation with [Siara] leading up to their in-person encounter and the effect his actions had on her." (Formatting altered.) Undoubtedly, Butler has a due process right to be sentenced based on accurate information. *See State v. Tiepelman*, 2006 WI 66, ¶9, 291 Wis. 2d 179, 717 N.W.2d 1. To obtain resentencing based on a sentencing court's use of inaccurate information, a defendant "must show both that the information was inaccurate and that the court actually relied on the inaccurate information in the sentencing."[6] *Id.*, ¶26 (citation omitted). Information is inaccurate if it was "extensively and materially false." *State v. Travis*, 2013 WI 38, ¶18, 347 Wis. 2d 142, 832 N.W.2d 491. The court actually relies on inaccurate information if it "gave 'explicit attention' or 'specific consideration' to it, so that the misinformation 'formed part of the basis for the sentence.'" *Tiepelman*, 291 Wis. 2d 179, ¶14 (citation omitted). Whether the trial court relied on materially inaccurate information to impose its sentence is an issue of law that we review de novo. *State v. Coffee*, 2020 WI 1, ¶17, 389 Wis. 2d 627, 937 N.W.2d 579.

---

[6] If Butler meets that heavy burden, the State must then prove the error was harmless beyond a reasonable doubt. *See State v. Tiepelman*, 2006 WI 66, ¶26, 291 Wis. 2d 179, 717 N.W.2d 1.

¶32   Butler asserts that the version of the events as portrayed by the State "labels Mr. Butler a cunning predator who took advantage of an unsuspecting child," but he argues that the text messages actually reveal that there was no "ruse to lure [Siara] to Mr. Butler"; they had been discussing BDSM sexual intercourse all along.  As Butler argued in his postconviction motion,

> [t]he prosecution and victim's family assert that [Siara] was lured away to a hotel under false pretenses when the messages make it very clear that [Siara] was asking to meet with Mr. Butler, expressed first and repeatedly her sexual interest in him, and that she wanted to be treated like a submissive without any prompting.

¶33   Butler also asserts that Siara was portrayed as "a happy, healthy, normal child and that she had a significant mental health break because of Mr. Butler's contact," but the text messages reveal that Siara "had a long history of mental illness and had previously been hospitalized before."  Finally, he argues that because of the State's and Siara's family's inaccurate portrayal of the circumstances of his crime, "the court concluded that … [Butler] clearly had the purpose of isolating [Siara] with the intent to take advantage of her," that Butler engaged in "grooming" behavior, and that "the public needed significant protection from Mr. Butler."  Thus, Butler concludes that the record "plainly established that the factual picture presented by the State and [Siara's] family was an inaccurate portrayal of the criminal acts committed by Mr. Butler and the court's remarks demonstrate that it actually relied upon the inaccurate information in imposing sentence."

¶34   We conclude that Butler has failed to establish that the circuit court actually relied on materially inaccurate information.  First, as to Siara's family's statements, the court summarized their allegations during sentencing by stating that Siara was "virtually destroyed emotionally" by this event, and it noted that

"the impact [of this crime] on the victim is significant and it's ongoing."[7] We conclude that this information was not inaccurate. Siara's family was entitled to provide the court with their *opinions* about the impact this assault had upon Siara. As the circuit court stated at the postconviction motion hearing, "I can't find that those statements especially by the victim's mother and the victim's grandmother are inaccurate factually. I say that because they are obviously advocating for their daughter and for their granddaughter, and their perception [that] what Mr. Butler did had an adverse impact on the victim." We see no error in the court's finding that Siara's family honestly believed that this sexual assault had a severe impact on her and would have a severe impact on her and her family in the future, perhaps particularly so given her mental health history and her dysfunctional family life. Butler offers no evidence to dispute that conclusion.

¶35 In terms of the allegedly inaccurate portrayal of the circumstances of the crime, we disagree that this rendered the information before the circuit court, as Butler argues, "extensively and materially false." *See Travis*, 347 Wis. 2d 142, ¶18. The facts remain that Butler knew from the very beginning that Siara was 14 years old; he knew that any relationship with Siara would subject him to possible criminal charges, given that in texts he questioned whether "I [am] going to prison for talkin to you lol" and Siara's statements that "[I] don't want you to catch a

---

[7] Many of Butler's assertions of inaccurate information involve comments made by Siara's family and "the remarks of the prosecution that provided a brazenly incorrect factual summary of the sexual assault and conduct leading to it." However, none of these statements came directly from the circuit court. In order for Butler to challenge his sentencing based on the court's use of inaccurate information at sentencing, he must demonstrate "that *the court* actually relied on the inaccurate information," *see State v. Travis*, 2013 WI 38, ¶21, 347 Wis. 2d 142, 832 N.W.2d 491 (emphasis added), by giving it "'explicit attention' or 'specific consideration,'" *see Tiepelman*, 291 Wis. 2d 179, ¶14 (citation omitted). Accordingly, we will address only the court's statements that Butler identifies.

case" and that their interest in each other "isn't a bad thing, it's just illegal"; he knew that Siara had a history of mental illness and had previously been hospitalized; he knew that Siara had previously been "sexually assaulted and … was in an abusive sexual relationship"; and he knew that Siara had a difficult home life because of her mother's drug addiction.

¶36 Nevertheless, Butler still engaged in sexually explicit text conversations with a vulnerable 14 year old, which involved BDSM discussions. Furthermore, within these text messages he offered to buy her lunch; he offered to buy her lingerie; he repeatedly offered and attempted to transfer money to Siara to buy her a phone; he counseled her when she was having a bad day; and he offered to have her live with him and be his children's nanny.

¶37 Butler insists that he did not engage in "grooming" behavior, and so the circuit court's reference to grooming at sentencing was "misinformation" that "'formed part of the basis for the sentence' contrary to the law." However, we conclude that the text messages between Butler and Siara clearly demonstrate grooming behavior. *See Groom*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/grooming (last visited August 7, 2025) ("[T]o build a trusting relationship with (a minor) in order to exploit them especially for nonconsensual sexual activity."). The fact that Butler characterizes Siara as having been a willing participant changes nothing because she was legally unable to consent to sexual activity with Butler, and Butler could have, and most certainly should have, stopped all communications with Siara when he learned her age and thereafter acknowledged the risk he was taking by talking to her. As demonstrated by the text message exchange, once Butler began regularly

conversing with Siara, Butler's actions without a doubt showed, as the circuit court found, "premeditation" and were "predatory."[8] We agree with the State's assertion that Butler "took advantage of a vulnerable, sexually curious child from a dysfunctional family to have his way with her after he snuck her into his motel room."

¶38 In any event, as discussed above, defense counsel addressed this issue in his sentencing remarks, informing the circuit court that Siara's portrayal as a child who was unwillingly forced into sex was inconsistent with her sexually

---

[8] Butler also argues that both the State and Siara's family "asserted that [Siara] upon learning Mr. Butler's age stated that she was unsure if she should talk to him and that he pushed her to continue the conversation," but he contends "[t]hat is patently untrue" because Siara was the one who "would continue to reach out" after their initial contact. First, this information related to Siara's uncertainty was not only reported by the State in its sentencing remarks, but it was also reported by Siara in her interview with police, as recounted in the amended criminal complaint. Butler did not object to the circuit court relying on the complaint as the factual basis for his plea.

Regardless, we do not agree that Siara's statement was "patently untrue." Based on our review of the text messages, once Siara learned that Butler was 40 years old, she began to ask questions and make statements suggesting uncertainty, including "how the hell did you get my number"; "you are kinda scaring me, not gonna lie"; "dude [I] am 14, you randomly texted me. [Y]ou are 40. Which in all honesty, [I] don't believe"; and "I just don't understand," presumably referring to how he got her number and began messaging her. After they exchanged first names, it was Butler who continued the conversation by asking, "Why aren't you in school???" Thus, it is reasonable that Siara would have felt unsure about talking to Butler at first, given the circumstances and that she felt like he was pushing to continue the conversation by asking her questions, and given that their communication could, and should, have ended when Butler said, "I thought you were someone else that's all." From Siara's point of view, her statement to police was not a misstatement of the facts.

Butler also challenges Siara's statement to police that "at one point [Butler] told her that she shouldn't tell people that they are talking to one another." We note that in the messages, Butler asked Siara if she was "clearing this every so often so you don't get in trouble[?]" Based on the context, we assume "this" to mean Siara's message history on her Chromebook. Siara responded, "[I] mean [my mom] doesn't check my [C]hromebook there[']s a code on it and [I] haven't yet, but if you want me to [I] can." Butler replied, "Ok please do." It is reasonable that Siara could have perceived this interaction as Butler telling her not to tell anyone and to keep their text messages secret.

explicit text messages with Butler. The record demonstrates that this distinction was clear to the court, given that it agreed with defense counsel that it did not believe that Butler fit the definition of a pedophile, but it recognized that while the "initial contact was innocent, once he established the relationship his clear purpose was to isolate her and to have sex with her." The court went on to explain that Butler "utilized tactics that we see in sex predators," including giving Siara things and creating a relationship with "a young girl who is having difficulty … with relationships and adjusting to those teenage years" by coming into her life and "paying attention to her and then … abus[ing] that relationship for sexual gratification."

¶39 The circuit court's discussion here belies Butler's assertion in his reply brief that "[t]he court relied on [the] version of the story … that Mr. Butler picked up an unsuspecting teenager for lunch, only to pursue a sexual encounter that was never discussed," which he calls "simply incorrect." We do not see any statement by the court at sentencing that directly supports Butler's contention, and he fails to include a record citation for this claim. Instead, the court believed that Butler was entirely at fault for continuing to pursue the relationship and that he engaged in grooming behavior, despite any involvement that Siara had in furthering the conversations. We see nothing in the record demonstrating that the court was incorrect.

¶40 Thus, the circuit court did not rely on any materially inaccurate information at sentencing. At bottom, regardless of how enticing the victim was or how advanced she was sexually, Butler had a legal responsibility not to sexually assault a child who could not legally consent, and the court could reasonably conclude that he was a predator, given their text conversation and the manner in which the sexual assault occurred.

19

**III. New factor**

¶41    Finally, Butler argues that the text messages between himself and Siara were "highly relevant and material new evidence that was unknowingly overlooked at sentencing and [that] warrants sentence modification." (Formatting altered.)  A circuit court has inherent authority to modify a criminal sentence when the defendant demonstrates the existence of a new factor—that is, a fact or set of facts highly relevant to the imposition of sentence, but not known to the court at the time of sentencing, either because it was not then in existence or because it was unknowingly overlooked by all of the parties.  *State v. Harbor*, 2011 WI 28, ¶¶35, 40, 333 Wis. 2d 53, 797 N.W.2d 828.  The defendant bears the burden to demonstrate the existence of a new factor by clear and convincing evidence.  *Id.*, ¶36.  Whether a particular fact or set of facts constitutes a new factor is a question of law.  *Id.*  If a new factor is present, the circuit court must exercise its discretion to determine whether that new factor justifies modification of the defendant's sentence.  *Id.*, ¶37.  We review whether a new factor justifies sentence modification for an erroneous exercise of discretion.  *See id.*, ¶¶37-38.

¶42    Butler argues that the text messages were a new factor that "the sentencing court did not have access to," and "[w]ithout them, the sentencing court was left to make a factual determination and risk assumptions based upon incomplete information."  Although the State reiterates that the "substance of the text messages" was brought "to the court's attention," Butler disagrees.  According to Butler, counsel "hinted at [a] discussion about [Butler and Siara's] meeting being 'in the texts' without highlighting any specific texts," and these "vague citations to the text messages deprived the court of crucial context about precisely what [Siara] and Mr. Butler discussed and how those discussions mirrored what played out in the hotel room."

¶43    Butler further asserts that "[t]he circuit court [erroneously exercised[9]] its discretion by finding the new information did not warrant sentence modification" because "[t]he court entirely ignored the impact these messages had on the narrative at sentencing" and "sentenced someone who it believed had been grooming, manipulating, and completely shattering the mental health of a young woman." He generally contends that "[h]ad the entire set of text messages been provided, it is likely that Mr. Butler's conduct, while still criminal and inappropriate, would be viewed differently than what was previously described to the court and relied upon at sentencing."

¶44    We conclude that Butler has failed to establish the existence of a new factor by clear and convincing evidence. As noted, a new factor is "not known" to the circuit court at the time of sentencing, "either because it was not then in existence or because … it was unknowingly overlooked by all of the parties." *Id.*, ¶40. There is no dispute that the text messages were in existence at the time of sentencing, as defense counsel even testified that they were sitting in front of him on the table during sentencing.

¶45    We also conclude that the text messages were known to the circuit court and were not unknowingly overlooked by all of the parties. Although Butler argues that the "substance" of the texts was not shared with the circuit court because defense counsel did not "highlight[] any specific texts," our review of the record demonstrates that Butler may be misrepresenting the record. As

---

[9] We note that in his brief-in-chief and his reply brief, Butler uses the phrase "abuse of discretion" when referring to our standard of review. In 1992, our supreme court replaced the phrase "abuse of discretion" with "erroneous exercise of discretion." *See, e.g.*, **Shirk v. Bowling, Inc.**, 2001 WI 36, ¶9 n.6, 242 Wis. 2d 153, 624 N.W.2d 375.

21

demonstrated above, based on our reproduction of a portion of defense counsel's sentencing argument, *see supra* ¶10, the court was made sufficiently aware of the content of the text messages between Butler and Siara and how they related to the manner in which the sexual assault occurred. It is also clear that defense counsel did refer to specific text messages, including messages showing that the motel room was Siara's suggestion, and noted some questions Siara had asked Butler. Furthermore, Butler's argument is conclusory, given that he fails to specify which part of the text message exchange was not sufficiently discussed or what specific text messages should have been shared. As noted above, defense counsel made a strategic decision not to share all of the text messages with the court. Therefore, the text messages were not "unknowingly overlooked" by the parties. *See **Harbor***, 333 Wis. 2d 53, ¶40. Butler has failed to prove the existence of a new factor by clear and convincing evidence.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* Wis. Stat. Rule 809.23(1)(b)5.

22