<table>
<tr><td>

**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**April 14, 2026**

Samuel A. Christensen
Clerk of Court of Appeals

</td><td>

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

</td></tr>
</table>

<table>
<tr><td>

**Appeal Nos.**   **2023AP628-CR**
               **2023AP629-CR**

</td><td>

Cir. Ct. Nos.   **2017CF383**
           **2017CF735**

</td></tr>
<tr><td>

**STATE OF WISCONSIN**

</td><td>

**IN COURT OF APPEALS**
**DISTRICT III**

</td></tr>
</table>

STATE OF WISCONSIN,

     PLAINTIFF-RESPONDENT,

V.

JOSE SANTANA-CARRANCO,

     DEFENDANT-APPELLANT.

---

APPEALS from judgments and an order of the circuit court for Outagamie County: JOHN A. DES JARDINS and MARK G. SCHROEDER, Judges.[1] *Affirmed*.

---

[1] Judge Des Jardins presided over the joint trial and sentencing while Judge Schroeder decided the postconviction motion.

Before Stark, P.J., Hruz, and Donald, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1      PER CURIAM. Jose Santana-Carranco appeals from judgments convicting him (in 2 cases that were tried together) of 1 count of first-degree sexual assault of a child under the age of 13 and 2 counts of second-degree sexual assault of a child.  He also appeals from an order denying his motion for postconviction relief in both cases.  He claims that his trial counsel provided him with ineffective assistance in multiple respects.

¶2      We conclude that most of the errors Santana-Carranco attributes to his trial counsel fall short of constitutionally deficient performance and that Santana-Carranco has failed to demonstrate prejudice from the remaining alleged error.  Accordingly, we affirm the judgments of conviction and the postconviction order.

## BACKGROUND

¶3      We need not discuss the details of the sexual assault charges because they are not material to the ineffective assistance of counsel claims raised on appeal.  Broadly speaking, the charges were based upon allegations made by three children who had previously shared a residence with Santana-Carranco and his girlfriend.[2]

---

[2] Because the girlfriend shares a familial relationship with each of the children, we will not name her to protect the children's privacy.

¶4      The following facts are based upon the circuit court's findings and other testimony from the postconviction hearing or portions of the record that are not in dispute. Santana-Carranco's English was "not very good," and he was provided with a Spanish language interpreter at all of his court appearances. Following the withdrawal of his second attorney, Santana-Carranco privately retained Attorney Cole White to represent him at trial. White did not speak Spanish.

¶5      In order to save the family the cost of translation services, White relied upon family members such as Santana-Carranco's niece to translate between himself and his client, "except when [an interpreter] was absolutely needed." White also discussed Santana-Carranco's case with various members of Santana-Carranco's family throughout White's representation. White did not have the discovery materials translated for Santana-Carranco because Santana-Carranco's prior attorney had already done so.

¶6      Jail logs show that White visited Santana-Carranco in jail only twice prior to the trial. However, it was White's practice to "stack" visits to his multiple clients in the jail, and White believed that only the first client he visited would be listed in the logs in those situations. In addition, White saw Santana-Carranco at every court appearance and "often would spend upwards of an hour with him before or after" such appearances. White discussed a plea offer, discovery materials, and trial strategy with Santana-Carranco during the jail and courthouse visits.

¶7      Santana-Carranco refused the plea offer because he denied having contact with the children at the times and places the assaults were alleged to have occurred. Santana-Carranco wanted to present his girlfriend as an alibi witness to

testify that she was with him during all of the relevant time periods. White met with the girlfriend on three or four occasions to discuss her potential testimony. As the trial approached, however, the girlfriend's "story began to change quite dramatically" and she became less and less cooperative, until she "completely disappeared." White did not serve the girlfriend with a subpoena.

¶8 Ten days before Santana-Carranco's trial, the Wisconsin Supreme Court prospectively suspended White's license to practice law for a period of 15 months, effective 30 days after the court's decision, based upon 28 counts of misconduct unrelated to this case. Following voir dire, Santana-Carranco confirmed to the circuit court that he had discussed the disciplinary action with White and that he wanted White to remain on his case.

¶9 Santana-Carranco's girlfriend failed to appear at trial. White advised Santana-Carranco that, without his girlfriend's testimony, Santana-Carranco essentially had no defense, and White urged Santana-Carranco to reconsider accepting the State's plea offer. Santana-Carranco again refused to accept the offer because he was insistent upon his innocence. White was able to reach the girlfriend on the phone, and she told White that she was just running late and still planned to appear. She had not yet appeared, however, by the time the State rested its case and it was time for the defense to begin its case.

¶10 White declined to give an opening statement prior to either the State's case or the defense case. White did not want to tell the jury what he believed the girlfriend's testimony would be only to look like he had been fabricating the girlfriend's account if she did not appear. White also believed that Santana-Carranco's account would be more impactful coming directly from

4

Santana-Carranco himself, rather than being summarized by counsel immediately before Santana-Carranco testified.

¶11 Santana-Carranco took the stand, proclaimed his general innocence, and testified that specific allegations the three children had made against him were "untrue" or a "lie." On cross-examination, the prosecutor asked Santana-Carranco whether he was asserting that all three children were "completely lying about everything that happened" and whether he believed the tears that two of the children had shed on the witness stand were "fake crying." Santana-Carranco answered affirmatively that the children were lying but said that he did not know how to answer whether they were fake crying. White did not raise any objection that the prosecutor was calling upon Santana-Carranco to comment on the veracity of other witnesses because, as he explained at the postconviction hearing, that objection could have jeopardized the entire defense strategy of persuading the jury that the children were lying.

¶12 White began his closing argument by acknowledging that this was a "terrible case" that "sucks" and that the State had made "a strong argument." White proceeded to address the central question posed by the State of why the children would lie. He posited the possibility that they were not actually lying, but rather genuinely believed they had been abused because someone such as their mother or sister had repeatedly told them that story over a period of years, due to some unknown family discord. White then explained why the tears and emotion the children had exhibited on the witness stand were not a sure indicator that they were telling the truth, because "not many people are incredibly comfortable being up there" and even "big tough burly bikers and gang bangers sob on the stand" due to the pressure of being under the spotlight.

5

¶13 White next questioned the logic of the children's accounts based upon inconsistencies in their stories, the implausibility that some of the alleged abuse had happened within feet of adults, the delayed reporting to police, and the fact that Santana-Carranco was allowed to have continued contact with the children even after the children had made some disclosures to family members. White concluded that, however emotional or "heart-wrenching" the children's testimony was, the jury should find reasonable doubt because the children's accounts just did not "add up" or "make sense."

¶14 The jury rejected Santana-Carranco's testimony and convicted him on all three counts. White was replaced by successor counsel prior to sentencing, and Santana-Carranco does not challenge his sentences on appeal.

¶15 Following sentencing, Santana-Carranco filed a postconviction motion seeking a new trial based upon constitutionally ineffective assistance of counsel. Santana-Carranco specifically faulted White for: (1) failing to adequately meet or communicate with him prior to trial; (2) failing to convey the terms of the plea offer to him; (3) failing to subpoena Santana-Carranco's girlfriend; (4) failing to give an opening statement; (5) failing to object to the prosecutor's cross-examination of Santana-Carranco; and (6) failing to make a strong closing argument. The circuit court denied the motion after holding a postconviction hearing, and Santana-Carranco appeals.

## DISCUSSION

¶16 To establish a claim of ineffective assistance, a defendant must prove two elements: (1) deficient performance by counsel; and (2) prejudice resulting from that deficient performance. *State v. Sholar*, 2018 WI 53, ¶32, 381 Wis. 2d 560, 912 N.W.2d 89. We will not set aside the circuit court's factual

6

findings about what actions counsel took or the reasons for them unless they are clearly erroneous. *State v. Balliette*, 2011 WI 79, ¶19, 336 Wis. 2d 358, 805 N.W.2d 334. However, whether counsel's conduct violated the constitutional standard for effective assistance is ultimately a legal determination that this court decides de novo. *Id.* We need not address both elements of the test if the defendant fails to make a sufficient showing on one of them. *State v. Swinson*, 2003 WI App 45, ¶58, 261 Wis. 2d 633, 660 N.W.2d 12.

¶17 In order to demonstrate deficient performance, a defendant must overcome a presumption that counsel's actions fell within a wide range of professional conduct. *Strickland v. Washington*, 466 U.S. 668, 689 (1984). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citation omitted). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Reasonable strategic choices informed by counsel's investigation of the law and facts are virtually unchallengeable on appeal. *Id.* at 690.

¶18 A defendant proves prejudice by demonstrating there is a reasonable probability that, but for counsel's unprofessional conduct, the result of the proceeding would have been different. *Id.* at 694. The reasonable probability standard does not require a showing that it is "more likely than not" that a jury would have acquitted the defendant. *Sholar*, 381 Wis. 2d 560, ¶¶33, 44. Still, the "reasonable probability" standard is tied to the reviewing court's confidence in the

outcome, and the "likelihood of a different result must be substantial, not just conceivable." *Id.*, ¶45; *Harrington*, 562 U.S. at 112.

¶19    As a threshold matter, Santana-Carranco contends that the suspension of White's license should, in and of itself, "cast[] a shadow on the presumption of attorney competence" and be treated as a complete denial of counsel, relieving Santana-Carranco of the need to satisfy the *Strickland* test. We disagree.   If the Wisconsin Supreme Court had found White completely unqualified or unfit to practice law, as Santana-Carranco argues the disciplinary decision signifies, it could have directed the suspension to take effect immediately or imposed a permanent revocation of White's law license. It did not do so. Rather, it imposed a limited penalty for misconduct. Because White was in fact licensed when he represented Santana-Carranco, at and prior to trial, we conclude that the standard *Strickland* analysis—including the presumption of counsel's competence—applies.

¶20    Santana-Carranco raises essentially the same claims of ineffective assistance on appeal as he did in the circuit court, although he has slightly reframed them.   First, Santana-Carranco claims there was a "lack of communication" between White and himself because: (1) White spoke English while Santana-Carranco spoke Spanish; and (2) White signed in to see Santana-Carranco at the jail only once or twice. These allegations ignore the circuit court's findings that White used Santana-Carranco's niece and other family members to communicate with him and that White met with him on additional occasions during "stacked" jail visits and before and after court proceedings. Based upon the court's findings—which were directly based on White's testimony at the postconviction hearing and are not clearly erroneous—there is no factual

basis to conclude that White provided deficient performance by failing to communicate with Santana-Carranco while the case was pending.

¶21 Second, Santana-Carranco claims that White had a "lack of trial strategy" because he presented only a "vague defense" at trial. Santana-Carranco asserts that a better strategy would have been to present alibi witnesses "who could corroborate the fact that [Santana-Carranco] wasn't even around the victims at the time mentioned." However, White *did* plan to present that very defense through Santana-Carranco's girlfriend, whom he met with several times in anticipation of producing her testimony. White's inability to present an alibi defense ultimately was the result of the girlfriend's failure to appear, not White's failure to plan a strategy for trial. On appeal, Santana-Carranco does not focus on other witnesses defense counsel could have called. White was then forced to adapt his strategy to conform to the circumstances that evolved—which included Santana-Carranco's refusal to reconsider accepting a plea deal even after being advised that he had no reasonably viable defense without the girlfriend's testimony.

¶22 We conclude that White's strategy at trial of characterizing the children's accounts as implausible and speculating that they may have been coached was not deficient, given the situation White faced. Counsel reasonably played the hand he was dealt.

¶23 Third, Santana-Carranco claims that White failed to set the tone and theme of the case when he chose not to give an opening statement. We conclude that counsel's decision to forgo opening statement was a reasonable exercise of professional judgment and not deficient, especially given that counsel did not know whether the girlfriend would appear to testify at trial.

9

¶24     Fourth, Santana-Carranco claims that White should have subpoenaed Santana-Carranco's girlfriend. Santana-Carranco did not present any testimony or affidavit from his girlfriend at the postconviction hearing to establish what testimony she would have given at trial, however. Santana-Carranco's own testimony as to what his girlfriend told him she would say at trial was hearsay, and it could not be used to support the truth of the matter asserted. *See generally* WIS. STAT. § 908.01 (2023-24). Because the record does not contain evidence that Santana-Carranco's girlfriend would have provided favorable testimony at trial, Santana-Carranco cannot demonstrate prejudice based upon White's failure to subpoena her.

¶25     Fifth, Santana-Carranco claims that White should have objected to the prosecutor's questions asking him on cross-examination to comment on the truthfulness of the children's testimony. Counsel's strategic decision not to object—which was done to avoid undermining Santana-Carranco's own testimony on direct that the children were telling lies or untruths—was within the bounds of professional conduct.

¶26     Finally, Santana-Carranco claims that White's closing argument was unprofessional because it used the term "sucks." We are not persuaded that it was unprofessional to acknowledge the emotional nature of the case in such a colloquial manner. White's closing argument reasonably urged the jury to focus on the alleged inherent implausibility and inconsistencies in the children's accounts rather than on the terrible nature of the allegations themselves.

¶27     We conclude that Santana-Carranco failed to establish that White provided him with ineffective assistance in any of the ways alleged. Accordingly, we affirm the judgments of conviction and the postconviction order.

*By the Court.*—Judgments and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5. (2023-24).

11