**COURT OF APPEALS
DECISION
DATED AND FILED**

**June 9, 2026**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP1983-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2020CF1784

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

 PLAINTIFF-RESPONDENT,

 V.

JEREME WILLIAM NEWTON,

 DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for Brown County: TAMMY JO HOCK, Judge. *Affirmed*.

Before Stark, P.J., Hruz, and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Jereme Newton appeals from a judgment of conviction, entered following a jury verdict, convicting him of several counts,

including first-degree reckless homicide, as a party to a crime. He also appeals from an order denying his motion for postconviction relief. On appeal, he raises four ineffective assistance of counsel claims. For the following reasons, we affirm.

## BACKGROUND

¶2 The State charged Newton with one count of first-degree reckless homicide, as a party to a crime, contrary to WIS. STAT. § 940.02(2)(a) (2023-24),[1] one count of obstructing an officer, and four counts of bail jumping, all as a repeater. The charges stemmed from allegations that an individual overdosed and died after using heroin that Newton provided. According to the complaint, the medical examiner concluded that the victim "died following an acute intoxication due to the combined effects of heroin, methamphetamine, gabapentin, and clonazepam."

¶3 The case proceeded to a jury trial, where Newton was represented by counsel. During the jury instruction conference, the circuit court and the parties addressed the contents of the jury instruction for first-degree reckless homicide.[2] The State requested that the court use an updated version of the pattern jury instruction for WIS. STAT. § 940.02(2)(a) that was not yet available online but had been approved by the Criminal Jury Instructions Committee. The State had not previously shared the updated instruction with defense counsel or the court. The

---

[1] All references to the Wisconsin Statutes are to the 2023-24 version.

[2] Pertinent here, WIS. STAT. § 940.02(2)(a) provides that "[w]hoever causes the death of another human being" is guilty of a Class B felony under the following circumstances: "By manufacture, distribution or delivery" of a controlled substance, "if another human being uses the controlled substance … and dies as a result of that use."

2

updated jury instruction explains that the State must prove, inter alia, that the victim "died as a result of the use of" the delivered controlled substance, which "requires that the use of the controlled substance was a substantial factor in causing the death." *See* WIS JI—CRIMINAL 1021 (2024). The updated instruction further states that a "substantial factor need not be the sole or primary factor causing death" and that "[t]here may be more than one cause of death." *Id.* The former jury instruction for § 940.02(2)(a), which defense counsel urged the court to use, did not expound on the meaning of "substantial factor." *See* WIS JI—CRIMINAL 1021 (2011).

¶4 Defense counsel objected to the use of the State's proposed jury instruction, arguing that the instruction was not published or otherwise available to the public and that the theory of the defense up to that point of the trial was that "if you take heroin out, the other substances still kill [the victim]." The circuit court granted the State's motion to use the updated jury instruction, explaining that the modifications to the instruction were not based on new case law and was approved by the Committee. Given the court's ruling, defense counsel explained that she was no longer going to call the defense's expert witness, who would have testified that there was not enough heroin in the victim's body to be the *sole* cause of his death. The jury found Newton guilty of all counts charged, including first-degree reckless homicide.

¶5 Afterward, Newton filed a motion for postconviction relief, arguing that his defense counsel provided constitutionally ineffective assistance in four respects, including by not understanding the law surrounding first-degree reckless

homicide. The circuit court denied Newton's postconviction motion following a *Machner*[3] hearing.

¶6 Newton now appeals.

## DISCUSSION

¶7 On appeal, Newton renews the four ineffective assistance of counsel claims from his postconviction motion. A criminal defendant has a constitutional right to the effective assistance of counsel. *State v. Breitzman*, 2017 WI 100, ¶37, 378 Wis. 2d 431, 904 N.W.2d 93. "To demonstrate that counsel's assistance was ineffective, the defendant must establish that counsel's performance was deficient and that the deficient performance was prejudicial." *Id.* "If the defendant fails to satisfy either prong, we need not consider the other." *Id.*

¶8 "To establish that counsel's performance was deficient, the defendant must show that it fell below 'an objective standard of reasonableness.'" *Id.*, ¶38 (citation omitted). "To establish that deficient performance was prejudicial, the defendant must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.*, ¶39 (citation omitted). "[A] defendant need not prove the outcome would 'more likely than not' be different in order to establish prejudice in ineffective assistance cases." *State v. Sholar*, 2018 WI 53, ¶44, 381 Wis. 2d 560, 912 N.W.2d 89 (citation omitted).

---

[3] *See* *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

¶9 "Whether a defendant was denied effective assistance of counsel is a mixed question of law and fact." *Breitzman*, 378 Wis. 2d 431, ¶37. "The factual circumstances of the case and trial counsel's conduct and strategy are findings of fact, which will not be overturned unless clearly erroneous; whether counsel's conduct constitutes ineffective assistance is a question of law, which we review de novo." *Id.* We may affirm the circuit court's denial of each of Newton's ineffective assistance of counsel claims on different grounds than those relied on by the court. *See State v. Earl*, 2009 WI App 99, ¶18 n.8, 320 Wis. 2d 639, 770 N.W.2d 755. "[W]hen we affirm on other grounds, we need not discuss our disagreement with the [circuit] court's chosen grounds of reliance." *Id.*

## I. First-degree reckless homicide jury instruction

¶10 Newton first contends that his defense counsel was constitutionally ineffective by crafting a defense to the first-degree reckless homicide charge "without the knowledge of how the jury would be instructed as to what" constituted a "substantial factor." Newton claims that defense counsel essentially relied on the "wrong definition of 'substantial factor'" in preparing for trial by overlooking the Committee's comment in the previous jury instruction for first-degree reckless homicide, and, more specifically, the case law cited therein, establishing that a "substantial factor" need not be the sole or primary factor causing death and that there may be more than one cause of death.

¶11 Newton further argues that he was prejudiced by defense counsel's error because she "argued throughout the case … that there may have been other drugs and/or a combination of other drugs provided by more than one person that would have caused the death of the victim," and, therefore, "Newton's alleged

contribution was not a 'substantial factor' (i.e., enough of a cause by itself and not the leading cause)."

¶12    At the *Machner* hearing, defense counsel testified that "[o]ur strategy going into trial was Mr. Newton did not give … [the victim] any heroin." Defense counsel explained that "even if the jury did not believe" this theory, counsel expected to argue in the alternative that Newton provided "a small amount" of heroin compared to the "many things" that the victim had in his system that could have "jointly produce[d]" his death.

¶13    As to this latter theory, defense counsel agreed that the actual definition of substantial factor, as outlined in the current jury instruction, the previous jury instruction, and established case law, "undermined what [she was] presenting at trial." Defense counsel further agreed that after the circuit court overruled her objection to the new jury instruction, she was forced to "rethink" her trial strategy on the second theory of defense by, for example, not calling the expert to testify. However, defense counsel also agreed that she was aware of the case law on this topic and that she had "hoped" the circuit court "wouldn't give that instruction or that expanded definition of substantial factor." The court credited defense counsel's *Machner* hearing testimony and concluded that counsel did not perform deficiently because she shifted her trial strategy after the court's ruling.

¶14    We conclude that Newton has failed to demonstrate that he was prejudiced by his defense counsel's potentially deficient performance with respect to the jury instruction. To begin, Newton does not allege that the updated jury instruction changed the standard of proof rather than clarifying the existing standard under WIS. STAT. § 940.02(2) in a manner consistent with existing case

law. More importantly, Newton does not explain, let alone prove, how defense counsel's prior knowledge of the updated language would have helped his defense or how counsel's alleged lack of knowledge of the updated language affected the outcome of the proceedings. We agree with the State that while the updated jury instruction "language undercut the usefulness of Newton's expert, there is nothing to suggest that prior knowledge of that language would have saved Newton's backup defense or his expert's testimony."

¶15 Newton contends that the second theory of defense was "viable" and that defense counsel's potential deficient performance prevented the defense from being successfully pursued. However, Newton does not explain how that defense was viable, which is particularly problematic given defense counsel's statements to the circuit court at trial. In particular, defense counsel informed the court that the defense's expert would testify that any heroin in the victim's system would have been a "substantial factor" in causing the decedent's death in conjunction with the other substances.

¶16 Additionally, Newton largely ignores defense counsel's *Machner* hearing testimony that the first theory of defense at trial was that Newton did not deliver any heroin to the victim, either personally or as a party to the crime. He fails to explain how the updated jury instruction affected this theory of defense, and we see nothing in the record to support a conclusion that there is a reasonable probability that, but for counsel's potential deficient performance, the result of the proceeding would have been different.

## II. Leading questions

¶17 Newton next argues that his defense counsel was constitutionally ineffective by failing to object to the State's use of leading questions during its

direct examination of multiple witnesses, including two county investigators, a detective, and the medical examiner.

¶18    Defense counsel's *Machner* hearing testimony on this issue was limited to testimony about her general practice when handling an opposing party's leading questions at a jury trial. Defense counsel testified that she sometimes objects to leading questions but that it depends on the situation. After defense counsel testified about her usual strategy related to challenging leading questions, Newton dropped the line of questioning altogether. Notably, Newton did not question defense counsel about any specific instances at trial when she failed to object or her reasoning for not objecting.

¶19    The State contends that Newton failed to sufficiently make a record on this issue at the *Machner* hearing. Newton does not respond to this argument on appeal, and we therefore deem it conceded. *See United Coop. v. Frontier FS Coop.*, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578 (stating that an appellant's failure to address an argument made in the respondent's brief may be taken as a concession).

¶20    Even if Newton had responded, we agree with the State that Newton failed to sufficiently preserve this particular ineffective assistance of counsel claim. "[I]t is a prerequisite to a claim of ineffective representation on appeal to preserve the testimony of trial counsel. We cannot otherwise determine whether trial counsel's actions were the result of incompetence or deliberate trial strategies." *State v. Machner*, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979).

¶21    Because defense counsel's testimony with respect to handling opposing parties' leading questions at a jury trial only touched on her general

strategy, we conclude that counsel's *Machner* hearing testimony is insufficient for this court to determine whether her decisions, or lack thereof, not to object to leading questions at this trial were the result of incompetence or a deliberate trial strategy. Therefore, given the foregoing and the "strong presumption that trial counsel's conduct 'falls within the wide range of reasonable professional assistance,'" *see* ***Breitzman***, 378 Wis. 2d 431, ¶38 (citation omitted), we decline to conclude that defense counsel performed deficiently by failing to object to some of the State's leading questions, *see* ***Machner***, 92 Wis. 2d at 804 (declining "to find that the manner in which counsel defended the appellant was of such a nature as to cause us to find him incompetent" because "the record [was] devoid of any testimony from defendant's trial counsel regarding his conduct in the defense of his client").

## III. Pretrial motions

¶22 Next, Newton asserts that his defense counsel was constitutionally ineffective by failing to file an other-acts motion to introduce evidence from the victim's fiancée that Rene Puente "supplied drugs to the deceased in the past without the involvement and participation of Newton."

¶23 At trial, defense counsel asked the victim's fiancée on cross-examination if she made a statement to law enforcement during its investigation that she knew "the son of a bitch who probably gave" the drugs to the victim. The victim's fiancée confirmed she had made that statement to law enforcement, and she testified that she was referring to Puente. The State objected when defense counsel attempted to elicit testimony from the victim's fiancée regarding whether Puente had "supplied drugs to [the victim] in the past" and why she had informed law enforcement that Puente was "probably" the person who

gave the victim the drugs. During a sidebar, defense counsel acknowledged that her questions attempted to elicit "prior bad acts," and she informed the circuit court that it would not happen again.

¶24 At the *Machner* hearing, the victim's fiancée testified that although she had never witnessed Puente giving heroin to the victim, she knew that Puente had supplied the victim with heroin approximately six months before his death because the victim told her that Puente had given him the drugs. The victim's fiancée further stated that she saw text "messages on [the victim's] phone" approximately six months before his overdose, wherein Puente and the victim had a "back and forth." The circuit court determined that the victim's fiancée's testimony would not have been admissible at trial because it was hearsay and propensity evidence.

¶25 We conclude that Newton has failed to demonstrate a reasonable probability that, but for defense counsel's failure to file an other-acts motion, the result of the proceeding would have been different. More specifically, even if the victim's fiancée's testimony concerning Puente's prior drug dealing to the victim was admissible, there is not a reasonable probability that the result of the proceeding would have been different had the jury heard that testimony. The jury was well aware that Puente was involved with obtaining the heroin from Newton for the victim, as the State's theory of the case was that Puente was the "middler"—that is, the person who set up the transaction in exchange for money and heroin for personal use—and that Newton was the "supplier" of the heroin.

¶26 For example, the State presented evidence that the victim contacted Puente seeking heroin the day before the overdose, that Puente had been in contact with Newton several times on the day of the overdose, and that Puente had

contacted Newton for unnamed drugs just three days before the overdose. Furthermore, the State presented video surveillance footage from the hotel where the victim overdosed showing Puente and Newton together in the hallway outside of the victim's hotel room, and phone records demonstrated that Puente was in contact with the victim immediately before Puente and Newton arrived at the hotel. In addition, a detective testified that Puente informed him that he "may have used heroin" "upon visiting the hotel" the night the victim died. The jury also heard that Puente was charged separately for his involvement in the victim's death and that he had received immunity in exchange for his testimony at Newton's trial. This evidence, in conjunction with the victim's fiancée's testimony that she believed Puente had sold the heroin to the victim, clearly demonstrated to the jury that Puente was involved in distributing heroin to the victim without admission of the other-acts evidence at issue.

¶27 In addition, even if the victim's fiancée had testified that Puente sold heroin to the victim in the past, the State's evidence against Newton overwhelmingly demonstrated that he was the supplier of the heroin that caused the victim's death. Again, the State presented evidence that Newton entered the victim's hotel room just prior to his death. Moreover, the jury heard evidence that law enforcement located heroin in Newton's residence and that Newton admitted that the heroin located in his residence was his, that he intended to sell some of that heroin, and that he had sold heroin in the past. Phone records also demonstrated that Puente had contacted Newton three days before the overdose to obtain unnamed drugs and that the two had also been in contact several times on the day of the overdose. While there was no documented communication between Newton and the victim, a detective testified that it is "very common" for a drug supplier to distance himself or herself from the drug purchaser. Moreover, Puente

11

confirmed that the victim did not appear to be under the influence of any drugs when he and Newton met him at his hotel room, but he later received a voice message from the victim wherein he "sounded like he was under the influence."

¶28 The following day, law enforcement found the victim deceased in his hotel, and the State presented evidence from a medical examiner that the victim died "following an acute intoxication due to the combined effects of heroin, methamphetamine, gabapentin, and clonazepam." The medical examiner further stated that the amount of heroin in the victim could have, by itself, caused the victim's death. Given the State's strong case against Newton, and the admitted evidence showing that Puente was involved with Newton in providing the victim heroin, there is not a reasonable probability that the result of Newton's trial would have been different if the jury had learned that Puente had sold drugs to the victim in the past.

## IV. Weight of the drug

¶29 Lastly, Newton contends that his defense counsel was constitutionally ineffective by failing to elicit testimony concerning the amount of heroin found at the crime scene. Puente testified at trial that he reached out to Newton to obtain heroin after receiving a message from the victim stating that he wanted to purchase a "50-piece" of heroin. Puente stated that a 50-piece is "[a] couple tenths," "[t]wo tenths," of heroin. Puente further stated that he and Newton met at a gas station and then traveled to the victim's location at a hotel. According to Puente, the victim gave Newton $50 and received the 50-piece of heroin from Newton. Puente stated that the victim gave Puente a "[s]mall amount of heroin" (approximately "half of a tenth" or "half a point") and $15 for setting up the

transaction. Afterward, Puente and Newton left the hotel, and Puente later learned that the victim had died.

¶30 Although an admitted Wisconsin State Crime Laboratory report stated that the lab received 0.213 +/- .003 grams from law enforcement for testing, defense counsel did not elicit testimony regarding this fact. Despite this omission, defense counsel stated during her closing argument that there was a discrepancy between the weight of the heroin that Puente testified that Newton delivered and the amount of heroin found at the crime scene. Specifically, defense counsel argued that the reported .213 grams "was more than was supposedly given in the first place, let alone [the victim] using enough to overdose on. There was no way that the heroin could have been a substantial factor in his death."

¶31 During deliberations, the jury asked several questions pertaining to the weight of the heroin found at the crime scene and whether there was a lab report verifying the amount of heroin that defense counsel referenced during her closing argument. The circuit court did not permit the jury to see the crime lab report because no witness testified as to the weight of the heroin found at the crime scene or received by the lab. The parties agreed that the jury could "still ask for a lab report later," and the court instructed the jury that "[a]rguments of counsel are not evidence." The jury did not make another request for the lab report.[4]

---

[4] Newton argues that the jury did request to see the "NMS lab report." However, as the State notes, the parties agreed at trial that this request was in reference to the victim's toxicology report, and the record supports that consensus.

¶32    According to Newton, he was prejudiced by defense counsel's failure to elicit testimony concerning the weight of heroin found at the crime scene because that evidence raised a question as to how "more heroin end[ed] up at the lab for testing than was actually, and allegedly, delivered in the first place." Newton contends that given the jury's questions during deliberations, "[t]he logical implication is that the jury had doubts concerning the testimony of Puente as to what, if any, heroin was allegedly delivered by Newton." Stated differently, Newton argues that defense counsel's failure prevented the jury from fully considering that the "State's star witness was lying to avoid the blame because more heroin ended up at the lab for testing than was testified to by Puente as being delivered by Newton."

¶33    We again agree with the State that Newton has failed to demonstrate a reasonable probability that the result of the proceeding would have been different but for defense counsel's failure to elicit testimony concerning the weight of the heroin found at the crime scene.

¶34    While defense counsel's closing argument highlighted a discrepancy between Puente's memory of how much heroin Newton sold the victim and how much was recovered at the crime scene, this discrepancy was negligible and, as the State argues, was "only relevant to the credibility of Puente's estimation" of how much heroin constituted a "50-piece." The only heroin found at the crime scene was located in a pill bottle wrapped in tinfoil, consistent with one delivery. Furthermore, aside from the weight discrepancy stemming from Puente's memory, there was no evidence presented at trial suggesting that the victim had used heroin other than that provided by Newton, either through Newton's sale to him or from the amount the victim then gave Puente for setting up the transaction.

¶35    The evidence presented was consistent with the State's theory of the case that Puente was the "middler"—who "set up [the] drug deal between" the victim and Newton in exchange for money and a small amount of heroin—and that Newton was the "supplier." Indeed, Puente informed a detective that he "may have used heroin" "upon visiting the hotel" the night the victim died. Puente's drug use with the victim on the night of the victim's death was corroborated by the surveillance footage, which showed that Puente remained in the hotel room with the victim for a short time after Newton exited the room; by the voice message wherein the victim described to Puente how he was feeling after taking the drugs; and by the fact that law enforcement did not locate any drug paraphernalia in the victim's hotel room.

¶36    It was therefore reasonable for the jury to have concluded that Newton provided the only heroin used by the victim and that there was not any other heroin located in the hotel room, or used by the victim, other than that provided by Newton. Any heroin Puente and the victim may have used after Newton left the hotel room was either the heroin given by the victim to Puente as compensation (using heroin purchased from Newton) or the remaining heroin sold to the victim by Newton. Under these circumstances, the amount of heroin found at the crime scene would be the same or similar to that which Puente testified the victim purchased from Newton, and Newton would have been guilty of first-degree reckless homicide, as a party to a crime, as the jury found.

¶37    The evidence at trial also supported the State's theory that Newton, not Puente, was the "supplier" of the heroin. Law enforcement located heroin in Newton's residence, Newton admitted that the heroin located in his residence was his, admitted that he intended to sell some of that heroin, and admitted that he had sold heroin in the past. The State also presented testimony from a witness who

stated that she overdosed on heroin provided by Newton just four years before the victim's death in this case.

¶38 The State's theory was further corroborated by evidence that the victim contacted Puente seeking a "50-piece" of heroin the day before the overdose, that Puente had been in contact with Newton several times on the day of the overdose, that Puente had contacted Newton for unnamed drugs just three days before the overdose, that Puente and Newton arrived at the victim's hotel room together, and that Puente was in contact with the victim immediately before Puente and Newton arrived at the hotel.

¶39 In other words, Puente's memory as to how much heroin constituted a "50-piece" had limited relevance to Newton's guilt or innocence because the State presented compelling evidence demonstrating that Newton supplied the only heroin used by the victim and that no other individual supplied heroin to the victim on the night of his death. Accordingly, the circuit court correctly observed that "[w]hile Newton now wishes to frame the jury's questions favorably in support of his claims, the questions could just as easily have been the jury using the weight of the recovered heroin to gauge Puente's credibility." Given the limited relevance of the weight of the heroin at the crime scene, Newton cannot show that defense counsel's failure to elicit testimony as to that fact impacted the outcome of the trial in any way.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.